James F. TOAL, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 11052.

United States District Court
D. Connecticut.

Dec. 4, 1969.

Alfred S. Julien, New York City, Alfred F. Celentano, New Haven, Conn., for plaintiff.

Hubert M. Crean, J. Charles Kruse, Trial Attys., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

This is an action brought by the plaintiff under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), seeking to recover for injuries allegedly caused by the negligence of the defendant's doctors who treated the plaintiff at the Veterans Administration Hospital in West Haven, Connecticut.

The plaintiff, James F. Toal, now 52 years old, suffered a back injury while serving in the Navy during World War II. This injury entitled him to receive medical treatment for his back at Veterans Administration Hospitals in the future. After his discharge from the service in 1946, he rejoined the New York City Police Department.

Toal's back pains persisted and in October, 1951, he was admitted to the Columbia Presbyterian Hospital in New York City for a laminectomy and spinal fusion of the L–4 through S–1. Because his back condition was found to be service connected, he received a 60% disability compensation award from the Veterans Administration. In 1952 he retired on disability from the police department and entered the insurance business. Two years later the plaintiff was hospitalized for six weeks for a condition diagnosed as "arteriosclerotic heart disease with coronary insufficiency and anginal syndrome." He made a satisfactory recovery and this condition has not been a source of difficulty since that time.

During the period 1956–1960, Toal was earning an average of approximately $28,000 per year. In 1956 he was named "Man of the Year for the Mutual Benefit Life Insurance Company," and later became the head of the estate and pension planning department for Financial Planning Corporation.

In June, 1961, the plaintiff traveled to Austria where his back condition took a severe turn for the worse. He was treated by several doctors recommended by the American Consulate, and in January, 1962, he was admitted to the Federal Public Hospital for Neurosurgery in Bad Ischl, Austria. A myelogram was performed with a watersoluble dye; the findings indicated the necessity for renewed surgical intervention in the area of the third intervertebral space. During this period of time he was considered 100% disabled and unemployable.

In April, 1962, Toal returned to the United States in order to receive treatment at the Veterans Administration Hospital, West Haven, Connecticut. The Hospital has a professional working relationship with the Yale University Medical School which supervises a residency training system there. Graduation from a medical school, an internship, and a residency in general surgery are prerequisites for admission to the three-year residency in orthopedic surgery at the Hospital.

Toal entered the Hospital on May 1st, and became the patient of Dr. John Elliott who was in the eleventh month of his first year of a residency in orthopedic surgery. On May 2, 1962, Toal was evaluated by the Neurosurgery Service and a myelogram was recommended to evaluate his back problems.

Myelography involves the introduction of an iodized radio-opaque contrast material into the patient's spinal cord by means of a lumbar puncture, usually at the interspace between L2 and L3, with an 18 gauge needle. First the spinal fluid is measured and manometric tests are performed. If there is a free flow of spinal fluid, a small amount of it is removed for protein examination, a cell count and other tests. Then usually about 10 to 15 cc.'s of pantopaque are inserted into the spinal column with the patient in a lateral recumbent position. He is then turned over to a prone position on a flat table that can be tilted. The entire spine is scanned by X ray as the patient is placed at different angles. If the cervical region is to be viewed, the head is lowered with the chin slightly

extended, and the pantopaque is allowed to run into the cervical area. Films are taken throughout this period. After the X rays are taken, the usual and customary procedure in the United States is to tilt the patient to allow the pantopaque to collect again in the lumbar sac and then to aspirate as much of the pantopaque as possible. The dye is removed with the needle positioned in the same pathway formed when the substance was inserted.

On May 23rd, Dr. Elliott and a radiologist performed the myelogram on Toal. Dr. Elliott operated the needle and the radiologist did the scanning and took the X rays. According to the plaintiff, the procedure caused him a great deal of pain and his legs were jerking as if they had "electric shocks in them." He testified that he heard Dr. Elliott exclaim, "I'm getting nothing but blood out," and that thereafter Dr. Elliott left the room for a few minutes. Upon Dr. Elliott's return, Toal claims he stated, "I can't find him," and then said, "I'll have to leave * * * the (pantopaque) in."

On or about June 1st, Dr. Elliott made the following entry in the hospital record:

> Myelogram today. Ten cc.'s of pantopaque injected L1–2 without difficulty. Good myelography attained. However, dye could not be removed, except for a few cc.'s, despite all efforts to do so. Finally, because trauma seemed to be outweighing the possible advantages of dye removal, it was decided to withdraw the needle.

Although at trial Dr. Elliott recalled very little of the circumstances surrounding the myelographic procedure on Toal, he was adamant that it was not his decision to remove the needle allowing the pantopaque to remain in Toal's body but that the radiologist instructed him to stop the procedure. Since he "was learning at the time," Dr. Elliott testified, he would not "have dared to voice an opinion" on the subject.

During the remainder of Toal's stay in the Hospital, there was no further attempt to remove the pantopaque from his spinal column. No operation was performed. Toal testified that prior to his release from the Hospital on May 31st, Dr. Elliott admitted to him that the pantopaque was not removed but that it was "standard procedure" to leave it in, that "it would eventually absorb," and that there was "nothing to worry about."

Four days later the plaintiff was involved in an automobile accident as a result of which he was hospitalized for a month suffering from head, neck, and back injuries.

In February, 1963, the plaintiff returned to Austria. Because of his severe headaches, Dr. Eric Strasser took a series of skull X rays on March 7, 1964, which revealed the presence of globules of pantopaque in the cranial area in the sub-arachnoid spaces, the sylvian fissure, the sylvian cistern, and on the pia, a membrane covering the brain. It was on this date that the plaintiff first learned that the dye was lodged within his skull and that the presence of this material in that area might be harmful. After receiving several medical opinions that his symptoms were causally related to the retained pantopaque, the plaintiff instituted this action on July 27, 1965.

The plaintiff's primary claims of malpractice and negligence are (1) that Dr. Elliott was not qualified or competent to perform the myelogram, and (2) that the failure to remove the pantopaque at the completion of the myelogram was contrary to the standards of reasonable medical care required under the circumstances. The defendant denies these allegations and affirmatively contends the plaintiff's action is barred by the statute of limitations.

*Statute of Limitations*

A threshold question presented is whether the plaintiff's cause of action is barred by the statute of limitations which controls Federal Tort Claims Act cases. Under the provisions of the per-

tinent statute, 28 U.S.C. § 2401(b), a tort claim against the United States is barred "unless [action is begun] within two years after such claim accrues."

It is undisputed that the plaintiff knew at the time the myelogram was performed that the pantopaque was left in his body, that prior to his release from the Hospital he questioned Dr. Elliott concerning the wisdom of not removing the material from his spinal cord, and that from time to time thereafter he was critical of the medical decision not to aspirate the dye. From these facts the government argues that the plaintiff knew, or in the exercise of due diligence should have known, of the acts constituting the alleged malpractice in May, 1962, and therefore his action is time barred. Brown v. United States, 353 F.2d 578, 579 (9 Cir. 1965); Hungerford v. United States, 307 F.2d 99, 102 (9 Cir. 1962).

Under the facts of this case, the Court disagrees that the statute of limitations began to run on the date the plaintiff first learned of the *acts* which constituted the alleged malpractice. The plaintiff's medical experts testified that the pantopaque in plaintiff's skull gradually caused a condition known as arachnoiditis, an inflammation of the covering membrane of the brain, which in turn is primarily responsible for his injuries. While it is true that Toal, during several of his combative approaches in early 1963 to secure increased disability compensation from the government, did acknowledge that pantopaque was present in his back region, it is equally clear that the presence of the dye in his head and its probable injurious consequences were unknown and unknowable to him prior to the Strasser diagnosis in March, 1964. Thus there was a crucial time lapse between the date Toal knew the pantopaque was not removed and the date when he first learned that this act might bear a causative relationship to his sufferings.

In analogous circumstances the courts when considering limitations questions have uniformly rejected the traditional "date of negligent act" test and applied a more reasonable and commonsense criterion based on the date of discovery of the harm. See, e. g., Urie v. Thompson, 337 U.S. 163, 169–170, 69 S.Ct. 1018, 93 L.Ed. 1282, 11 A.L.R.2d 252 (1949) (silicosis); Ricciuti v. Voltarc Tubes, Inc., 277 F.2d 809 (2 Cir. 1960) (berylliosis); United States v. Reid, 251 F.2d 691 (5 Cir. 1958) (malpractice); Gemignani v. Philadelphia Phillies National League Baseball Club, 287 F.Supp. 465 (E.D.Pa.1967) (malpractice); Kuhne v. United States, 267 F.Supp. 649 (E.D. Tenn.1967) (myelofibrosis).

■ Until March, 1964, Toal did not know, nor in the exercise of reasonable care could he have discovered, that the pantopaque traveled to his brain region where it allegedly caused anachnoiditis. Therefore, "It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently, the afflicted [plaintiff] can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves * * *." Urie v. Thompson, supra, 337 U.S. at 170, 69 S.Ct. at 1025.

Accordingly, the plaintiff's cause of action is not barred by the statute of limitations. To hold otherwise would as a practical matter bar plaintiff's right of action before that right accrued. Barnes v. Sears, Roebuck and Company, 406 F. 2d 859 (4 Cir. 1969).

*Dr. Elliott's Qualifications*

The plaintiff contends that the defendant was negligent in permitting a resident to perform the non-radiological aspects of a myelogram.

There were conflicting expert opinions on this issue. There was testimony that a myelogram should be considered a radiological procedure, as at the Veterans Hospital, with the radiologist in charge, assisted by a resident. The procedure is performed under the direction and super-

vision of the radiologist who is responsible for all medical decisions made during the myelogram. On the other hand, in other hospitals referred to by plaintiff's experts, myelography is performed by a neurosurgeon or orthopedic surgeon, assisted by an X-ray technician or radiologist. Sound medical opinion and judgment support both schools of thought on this issue.

In the instant case Dr. Wayne Southwick, Chairman of the Section on Orthopedic Surgery at the Yale Medical School, approved Dr. Elliott as a qualified resident to assist in the performance of a myelogram by a radiologist at the Veterans Administration Hospital. At the time Dr. Elliott, a graduate of the Columbia College of Physicians and Surgeons, had completed a surgical internship at Johns Hopkins and a general surgical residency at St. Vincent's Hospital in New York City. In May, 1962, he was in the eleventh month of his first year orthopedic residency at the Veterans Administration Hospital, and had assisted in the performance of several myelograms prior to Toal's.

■ After carefully weighing all the expert testimony on this issue, the Court is of the opinion that the plaintiff failed to sustain his burden of proof on this claim of negligence and concludes that the residency system established at the Veterans Hospital in May, 1962, in association with the Yale Medical School, conforms to good and acceptable standards of medical practice and care.

*Failure to Remove the Pantopaque*

The plaintiff's primary claim of negligence concerns the failure to aspirate the pantopaque from his spinal cord.

At the outset it is important to note that the medical experts agreed that it is almost impossible to extract *all* the dye after a myelogram. If 90% of the material is removed the experts consider aspiration is successful and is complete. Apparently a small amount of pantopaque in the spinal sac is capable of being absorbed and is harmless. The plaintiff does not challenge this medical fact, but does contend that it was contrary to standard medical practice and procedure to allow 90% of the dye to remain in his body. As indicated, almost all of the 10 to 15 cc.'s of pantopaque remained in Toal's spinal cord when the procedure was discontinued on May 23rd.

There were significant areas of agreement in the medical testimony on this issue. Dr. William M. Hunter, an experienced and eminently qualified neurosurgeon, testified for the plaintiff that it was contrary to proper medical practice not to remove the dye after the myelogram. If the first attempt to aspirate failed, another attempt should have been made within 24 hours. He stated that the irritant effects of pantopaque were generally well known to the profession and that all possible precautions should have been taken to prevent the pantopaque running intracranially. Dr. Hunter contended there was no reason why the pantopaque could not or should not have been removed if competent physicians were performing the myelogram.

Similar testimony was elicited from another plaintiff's witness, Dr. David Smith, a general surgeon with long experience, except he did concede that in "dire circumstances" or if it were a question of "life or death," the dye need not be aspirated.

Dr. Elliott, who actually handled the needle in the instant case, admitted "if you can get the dye out, you should" but if "by removing the dye you feel you are going to do more harm than by leaving it in, based on medical opinion at that time, then I think you should leave it in."

Dr. Sidney W. Gross, a defendant's witness and a neurosurgeon with exceptional credentials, testified that in lumbar disc cases the usual and customary practice is to attempt to aspirate the dye at the completion of the myelogram because "it is better to get it out." He further stated that "On rare occasions when the patient has so much discomfort at the outset of the attempted removal, then we may on a subsequent day do another lumbar puncture and attempt to remove as much as we can."

Dr. Wayne Southwick, an orthopedic surgeon and Chief of Orthopedic Surgery at the Yale New Haven Hospital and at the West Haven Veterans Hospital, indicated that pantopaque was "a foreign body, you just like to get out."

These opinions were supported to a large extent by references to the medical literature on the subject. The manufacturer's directions on the use of pantopaque included a specific statement that the dye should be extracted at the completion of the myelogram. Dr. Robert Shapiro, a leading local radiologist and a recognized expert in the field of myelography, was listed as a government's witness, but was not called at trial. The plaintiff, however, introduced excerpts from his authoritative work on the subject, *Myelography,* published in 1962. On page 18 of his book, Dr. Shapiro states that since pantopaque "has a tendency also to become encysted and produce local arachniditis (Tarlov) * * * it should be completely removed." In addition, the record contains references to authoritative medical literature which prior to 1962 recommended the dye be removed after a myelogram.

It seems obvious to this Court, therefore, that the standards of reasonable care, skill and diligence in 1962 and now require that every effort be made to aspirate the pantopaque after a myelogram, except in unusual circumstances. Such unusual circumstances include but, of course, are not limited to (1) those rare instances in lumbar or cervical disc cases where, within a reasonable degree of medical certainty, the patient will incur severe traumatic effects from the removal, or (2) those myelographic studies designed to diagnose and localize other conditions (not involved here) which require that the dye remain within the body.

In the case at bar the plaintiff was unable to ascertain the name of the radiologist who was in charge of the myelogram. The plaintiff's commenda-ble efforts to present all relevant testimonial and documentary evidence indicate to the Court that, had he been able to secure the name and address of the radiologist, he would have made available this crucial testimony. The defendant, on the other hand, suggested at trial that it knew the identity of the radiologist involved, that he was no longer connected with the Hospital, and that he was practicing in another state. The Court is at a loss to understand why the defendant did not pursue this matter thoroughly to insure this important witness' appearance.

Since the pantopaque was not removed as it should have been, the only question remaining on the issue of negligence is whether this omission was justified in the light of medically sound extenuating circumstances. The Court is of the opinion that it was not.

No problems were encountered in the insertion of the needle or in the injection of the dye into Toal's spinal cord. The X-ray studies were satisfactory. It was only when Dr. Elliott started to aspirate the material that difficulty set in: blood instead of pantopaque was being withdrawn. An unsettled atmosphere developed, induced partially by the patient, who was certain he was being harassed while in great pain, and partially by the resident, who was uncertain as to the proper course to follow. Left to his own resources, Dr. Elliott was unable to resolve the problem. No satisfactory reason was offered why the more experienced radiologist-supervisor did not take over full command and control immediately. Instead he merely ordered that the procedure be abandoned. Reasonable medical care and attention required more.

Blood on aspiration was not a sudden emergency requiring the exercise of extraordinary enlightened medical judgment. Although it was a new experience for Dr. Elliott, which might explain his indecisive actions, it should not have been an unusual occurrence for the radiologist, if he possessed the requisite skill

and knowledge. Various alternatives were open to the radiologist and should have been explored before the dye was allowed to remain in Toal's spinal cord, thereby exposing him to risks well known at the time to the medical profession.

The presence of blood in the needle indicated only that the needle had strayed from the original pathway. The radiologist immediately should have instructed Dr. Elliott how to reposition the needle, or should have assisted him in this rather uncomplicated maneuver. If together they were unable to cope with the problem, they should have obtained help. Surely in the large Hospital with its multiple services, another radiologist, or a neurosurgeon, or an orthopedic surgeon, was available for consultation or assistance.

█ The Hospital Note of June 1st, stating that the needle was withdrawn because the "trauma seemed to be outweighing the possible advantages of dye removal," does not balance the scales or tip them in defendant's favor on this issue. This self-serving record was made long after the event by a person other than the one who made the decision. And, even assuming the prerequisites to abandonment existed on the day in question, the subsequent decision not to aspirate the dye on the following day did not conform to the applicable standards of care under the circumstances. The medical experts testified that the pantopaque was removable from the spine within 24 hours after insertion. Yet, without consulting the radiologist who supervised the myelogram, defendant's doctors determined a subsequent attempt to remove was not advisable. At the very least, Toal was entitled to a prompt and full disclosure of the risks involved in leaving the pantopaque in his body, so that he could weigh all the advantages and disadvantages, and thereby decided for himself whether or not another attempt should be made. Assurances that it was "standard procedure" to leave the dye in the spinal cord and that over 10 cc.'s would be "absorbed" were gross misstatements and lulled the plaintiff into a false sense of security.

Accordingly, the Court finds the plaintiff sustained his burden of proof on the issue of negligence.

*Causation*

It is uncontroverted that prior to the myelogram performed on May 23rd there was no pantopaque in plaintiff's skull, and that the pantopaque now permanently affixed to the membrane of his brain came from that myelogram. The plaintiff claims that these intracranial contrast medium deposits resulted in arachnoiditis which is the cause of his sufferings. The defendant, on the other hand, contends the dye is non-irritating and innocuous, and further argues in the alternative that, even assuming the material caused arachnoiditis, most if not all of the plaintiff's injuries pre-existed the myelogram. The latter position hits close to the mark.

█ The record is replete with credible medical testimony and references to accepted medical literature which support the plaintiff's contention that the encysted pantopaque can be a competent producing cause of arachnoiditis. In addition to the plaintiff's evidence on this point, two doctors assigned by the Veterans Administration to examine Toal reported they were of the opinion that the dye caused arachnoiditis in this case. The Court, therefore, finds the plaintiff sustained his burden of proof on this claim.

The difficult problem remains whether the arachnoiditis was a substantial factor in producing the plaintiff's injuries and damages. While it is true that arachnoiditis may cause each injury alleged by the plaintiff, the question is whether that condition *did*, within a reasonable degree of medical certainty, cause each of the injuries. In the usual case, the effects follow closely on the heels of the cause. Here, however, the plaintiff was in very poor physical shape prior to the myelogram, and following myelography he was involved in a severe automobile accident.

With these complicated intervening factors present in the case, the plaintiff's claims of injuries and damages must be considered *seriatim*.

### A) *Loss of Earning Capacity*

█ The plaintiff claims a substantial loss of earnings, based on his wages from 1956 to 1960. But the record is clear that Toal was unemployed and unemployable for a substantial period of time prior to the myelogram. In his own testimony the plaintiff acknowledged that in 1960 and 1961 his already bad back had become progressively worse to the extent that he "was practically unable to walk," "was crippled up very badly," and was unable to work since November, 1961. The Social Security Administration awarded the plaintiff a 100% disability rating in November, 1961. In January, 1962, the plaintiff's doctor, Dr. Grossendorfer-Schulte, wrote the Veterans Administration that Toal was "100 percent disabled and completely unemployable," and in that month Toal requested the agency to increase his disability from a 60% rating to a 100% rating.

Toal finally convinced the Veterans Administration to increase his disability to 100%; in doing so he made the following admissions in a series of letters: "I am now completely unemployable and have been since August 4, 1960"; "I respectfully submit that I am now and have been totally disabled since I opened this case in January, 1961, and that I am now and have been completely unemployable for at least the same period"; "* * * my service-connected back condition has not only prevented me from working at all, but it has put me out of business where I was capable of earning $25,000 a year."

Based on the foregoing, the Court finds the plaintiff failed to sustain his burden of proof on his claim that the effects of the myelogram resulted in a loss of earnings and earning capacity.

### B) *Loss of Opportunity*

The plaintiff contends he lost the opportunity to improve "his position in the insurance and mutual fund industry." For the reasons stated, supra, this claim is rejected; prior to the myelogram his prospects for future advancement and earnings in business were nil.

### C) *Headaches*

█ There is little question the plaintiff had a pre-existing history of sinus trouble and headaches, and that the automobile accident in 1962 was a proximate cause of an aggravation of this condition. However, the Court is satisfied that the severity of the pain and discomfort of these headaches has been increased appreciably by the arachnoiditis. The Court finds credible the plaintiff's testimony, corroborated by his medical experts, that the inflammation of the arachnoids causes him to have at times "unbearable" headaches, ringing in the ears, and occasional fainting spells. Moreover, Doctors Mayer and Dickson of the Veterans Administration Hospital confirmed in a report dated July 12, 1965, that Toal's "headaches are due to an arachnoiditis which was caused by the presence of pantopaque material in [the] region of the cisterna magna. The deposition of this material was apparently the result of lumbar and cervical myelogram performed at [the] VA Hospital, West Haven, Connecticut on May 23, 1963."

The Court finds the plaintiff sustained his burden of proof on this claim.

### D) *Cost of Drugs and Medications*

█ The plaintiff undoubtedly has and will incur expenses for drugs and medications to relieve his headaches, and damages will be awarded for these items.

### E) *Loss of Sense of Smell*

On September 13, 1968, Dr. Franklin Robinson, an eminent neurosurgeon, examined the plaintiff and found that his olfactory perception "was intact." This medical finding is accepted by the Court.

### F) *Vision*

█ Dr. Hunter testified that the plaintiff's double vision or diplopia on the right side was causally connected to

the pantopaque impairing the sixth cranial nerve. He further stated the plaintiff informed him he had no double vision prior to the myelographic studies in May, 1962. The government proved beyond doubt, however, that Toal had diplopia on the right side prior to the myelogram.

This damaging evidence casts suspicion on all of the plaintiff's testimony concerning his vision, and, therefore, this claim is rejected.

G) *Impotency*

This contention was withdrawn at trial.

H) *Life Expectancy*

The plaintiff failed to sustain his burden of proof that the probable length of his life was affected by the presence of the pantopaque in his skull.

I) *Anguish and Fear*

While it is true that the plaintiff is anxious and fearful about the poor state of his physical condition, these feelings to a large extent predated the myelogram. His long history of physical injuries is ample justification for the apprehensions and frustrations he experiences. However, it is reasonable to infer that his knowledge of being afflicted with arachnoiditis has had some effect on his mental state and on his ability to enjoy those life's activities which are available to him. Therefore, difficult as it might be to measure compensation for this claim under the circumstances, some damages will be awarded.

*Damages*

█ An award in the following amounts is found:

| | |
|---|---|
| Past pain and suffering—headaches, etc. | $ 7,000.00 |
| Future pain and suffering —headaches, etc. | 25,000.00 |
| Cost of medications, past and future | 2,500.00 |
| Anguish, loss of enjoyment, etc. | 5,000.00 |
| Total | $39,500.00 |

The Clerk will enter judgment in accordance with the findings and conclusions hereinabove. So ordered.