525 P.2d 393

**Roberto F. ESCOBEDO, Plaintiff-Appellant,**

v.

**AGRICULTURE PRODUCTS CO., INC., and American Employer's Insurance Company, Defendants-Appellees.**

**No. 1344.**

Court of Appeals of New Mexico.

June 26, 1974.

Rehearing Denied July 16, 1974.

Sutin, J., filed an opinion dissenting in part and concurring in part.

**468**

Glenn B. Neumeyer, Sosa & Neumeyer, Las Cruces, for appellant.

Edward E. Triviz, Las Cruces, C. Fincher Neal, Neal & Neal, Hobbs, for appellees.

## OPINION

WOOD, Chief Judge.

Plaintiff's appeal in this workmen's compensation case raises issues concerning: (1) refusal of medical services; (2) a gap in compensation benefits; (3) cost of a deposition; (4) reexamination of plaintiff and doctor-patient privilege; and, (5) attorney fees.

### Refusal of medical services.

The trial court found that plaintiff "has suffered and is suffering a total temporary disability" as a result of a compensable injury on December 31, 1970. The trial court also found that plaintiff "has refused and refuses to submit to a myelogram or to any medical or surgical treatment that might be indicated by the results thereof." It found that the myelogram and treatment indicated by the results of the myelogram "is reasonably essential to promote Plaintiff's recovery, and which would probably reduce Plaintiff's disability to fifteen percent (15%) of the body as a whole."

On the basis of the above findings, the trial court directed that compensation payments for temporary total disability be resumed on entry of judgment. It also directed plaintiff to submit to a myelogram and treatment indicated by the result of the myelogram. It ruled that if plaintiff failed to comply with the trial court's directive, compensation benefits were to be reduced to a fifteen percent (15%) permanent disability of the body as a whole.

Section 59–10–20, N.M.S.A. 1953 (Repl. Vol. 9, pt. 1) states in part: "If any workman . . . shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, the court may in its discretion reduce or suspend his compensation." Interpreting this language, Rhodes v. Cottle Construction Company, 68 N.M. 18, 357 P.2d 672 (1960) states: "An employee may not be denied compensation because of his failure or refusal to accept medical treatment unless it be shown that such refusal was arbitrary and unreasonable." There is no express finding that plaintiff's refusal of a myelogram and treatment indicated by the myelogram is arbitrary and unreasonable. However, the trial court did find that these procedures were reasonably necessary to promote plaintiff's recovery. Accord-

ingly, we interpret the trial court's findings to mean that plaintiff's refusal of the procedures was arbitrary and unreasonable.

■ Plaintiff asserts a finding that his refusal was arbitrary and unreasonable is erroneous. The parties, both in brief and argument, present this issue as a single question. The trial court's decision, however, has two parts, and our answer is directed to the two parts. One part involves the myelogram. We affirm the trial court's decision in reducing compensation. if plaintiff refuses to submit to a myelogram. We do so on the basis of the evidence presented. The second part involves treatment indicated by the myelogram. We reverse the trial court's decision in reducing compensation if plaintiff refuses to submit to treatment indicated by the myelogram. We do so because of a lack of evidence.

Plaintiff's injury is in the low back area. One diagnosis was that plaintiff had multiple degenerative joint disease in the lower thoracic and lumbar spine with chronic sciatica on the left due to a partial or complete ruptured disc at a lower lumbar level. The clinical findings of several physicians indicated the level of L5–S1. These physicians recommended a myelogram in order to arrive at a definite diagnosis and in order to determine what treatment was needed. At least one physician testified that a myelogram not only would assist in diagnosis but would help in disability evaluation.

Several specialists explained a "particular need" for a myelogram in this case. Plaintiff underwent a hemilaminectomy at the L5–S1 level, on the left, in 1954. Because of this prior surgery and abnormal clinical findings which could be attributed to the prior surgery, a myelogram was recommended in order for the specialists to determine whether there was nerve root compression at the present time and, if so, the level of the compression. There is evidence that a myelogram is a superior method for making such a determination in the low back area because it is more accurate than the discogram or electromyogram in

determining the level of a disc problem. The physicians favoring a myelogram stated a myelogram was either "usual" or "standard" and was a "reasonable" or "proper" procedure in this type of case.

There is conflicting evidence. A physiatrist (a medical doctor specializing in physical medicine and rehabilitation) testified that he does not use myelograms and most of the time would not be impressed with the results of a myelogram done by somebody else. An orthopedic surgeon testified there was no reason to perform a myelogram unless surgery was contemplated and there was insufficient neurological deficit to justify considering surgery in plaintiff's case. This orthopedist testified that healing time, with or without surgery, is about the same, and that surgery would not accelerate plaintiff's recovery.

■ Whether plaintiff's refusal of a myelogram is arbitrary and unreasonable is a question of fact. Rhodes v. Cottle Construction Company, supra. To the extent the foregoing evidence concerning a myelogram in plaintiff's case is legally sufficient, there is substantial evidence to support the determination that refusal of the myelogram was arbitrary and unreasonable. Plaintiff's contention is that the foregoing evidence, concerning the need for and uses of a myelogram, is legally insufficient to support a finding of arbitrariness and unreasonableness. We agree that more is required. Our concern is with the nature and the consequences of the procedure which is being refused, in this case a myelogram.

Numerous physicians testified in this case concerning a myelogram; not one of the physicians was asked to define a myelogram or describe what is involved when a myelogram is performed. 1 Schmidt's, Attorneys' Dictionary of Medicine (1973) defines "myelography" as the introduction of a contrast medium into the spinal canal, into the space between the pia mater and arachnoid membrane, so that the configuration of the subarachnoid space is brought out in x-ray pictures. See Wright v. Cele-

brezze, 246 F.Supp. 330 (E.D.Tenn.1965). Because the area of plaintiff's difficulties is in the low back, we assume the contrast medium would be introduced by lumbar puncture. Toal v. United States, 306 F. Supp. 1063 (D.Conn.1969), aff'd 438 F.2d 222 (2d Cir. 1971). The evidence supports the inference that the myelogram would be performed in a hospital and would require both a surgeon and a radiologist. Accordingly, we consider myelography to be in the nature of a surgical procedure.

■ Whether refusal of a surgical procedure is arbitrary or unreasonable is to be determined by the standard stated in Fowler v. W. G. Const. Co., 51 N.M. 441, 188 P.2d 160 (1947):

" . . . [A]n injured workman will be denied compensation for an incapacity which may be removed or modified by an operation of a simple character, not involving serious suffering or danger. A refusal to undergo an operation under such circumstances is deemed unreasonable. . . . On the other hand, if the operation be of a major character and attended with serious risk to life or member, the rule is that an injured employee's refusal to submit to such operation is deemed not unreasonable, and compensation should not be denied on that account. . . . "

There is no testimony in this case that a myelogram is a "major" procedure or is attended with a serious risk to the patient. There is evidence that the procedure is painful and there is "some hazard." Arachnoiditis can result if the inside of the arachnoid membrane reacts to the dye (contrast medium) and this produces pain and discomfort. Headaches can also be produced if the dural sac tears and the contrast medium leaks. If a nerve is punctured there may be long lasting pain. The specialist testifying as to these items stated that "there are very few collateral effects of mylography [sic]." The specialist testified that myelography has risks "but the risks are minimal, when you compare the amount of information you get." An or-

thopedist who did not favor a myelogram in this case testified the lay public has a lot of misconceptions about myelograms; that complications are very rare although they do occur once in awhile. Compare Wright v. Celebrezze, supra, where a myelogram is characterized as "a reasonably safe medical procedure."

In the light of the foregoing, we cannot say that plaintiff could reasonably refuse a myelogram as a matter of law. The unreasonableness of plaintiff's refusal being a factual determination, the question is whether substantial evidence supports the determination. The evidence of the need for the myelogram in this case, and the evidence of minimal risks being involved in the procedure, supports the trial court's determination that refusal was arbitrary and unreasonable.

■ Plaintiff's efforts to avoid this result are based on three items. One item is the contention that defendants had the burden of proving that the refusal was arbitrary and unreasonable. The evidence reviewed herein meets that burden. A second item is that plaintiff feared myelography. This is evidence to be considered on the question of a reasonable refusal but is not sufficient in itself to require a finding that refusal was reasonable.

The third item is that one may reasonably refuse a second myelogram. The claim is that plaintiff had undergone a myelogram in the past, presumably at the time of his surgery in 1954. There is testimony from physicians that plaintiff could reasonably refuse a second myelogram. Compare Bostic v. Dreher, 206 Pa.Super. 257, 213 A.2d 118 (1965). There is no factual basis for a claim of a prior myelogram unless such an inference can be drawn from the ambiguous testimony of a general practitioner. Assuming, but not deciding, that such an inference exists, the testimony of several specialists supports a contrary inference—that plaintiff had not had a myelogram prior to the myelogram recommended in this case. With conflicting inferences, the factual dispute was a matter for the

trial court to resolve. Such a conflict does not change the fact that the trial court's decision is supported by substantial evidence.

No issue is raised as to the amount of the reduction in compensation. Accordingly, we hold that the trial court did not err in reducing compensation to fifteen percent (15%) if plaintiff refuses the myelogram.

The trial court also directed plaintiff to submit to medical or surgical treatment indicated by the results of the myelogram. Many of the decisions discussing the refusal of myelograms do so in relation to surgery which had been recommended. See Sultan & Chera Corp. v. Fallas, 59 So.2d 535 (Fla.1952); Alexander v. Chrysler Motor Parts Corporation, 167 Kan. 711, 207 P.2d 1179 (1949). That is not the situation in this case. The myelogram was desired to aid in determining whether a disc problem existed and, if so, at what level. The conflicting evidence is that there was no reason for a myelogram unless surgery was contemplated. Even if surgery was contemplated, the trial court pointed out "no doctors have said for sure what the operation would be."

■ Until there is a recommendation concerning a surgical procedure, we cannot know whether plaintiff could reasonably refuse that procedure. The decisions indicate that it is not unreasonable to refuse "disc surgery" or a "laminectomy" because of the "major" nature of those operations. Evans v. Stearns-Roger Manufacturing Co., 253 F.2d 383 (10th Cir. 1958); Sultan & Chera v. Fallas, supra; Alexander v. Chrysler Motor Parts Corporation, supra; Tatum v. Palmer, 207 Tenn. 456, 340 S.W. 2d 914 (1960); Edwards v. Travelers Insurance Company, 202 Tenn. 364, 304 S. W.2d 489 (1957). Since we do not know what treatment, if any, would be indicated by a myelogram and, thus, do not know what surgery, if any, would be indicated, the decision that continues to reduce compensation if a myelogram is performed and plaintiff refuses the treatment indicated, if any, has no basis other than speculation.

Daniel Ornamental Iron Company v. Black, 47 Ala.App. 608, 259 So.2d 291 (1971), aff'd 259 So.2d 295 (1972).

We reverse the portion of the decision providing that plaintiff's compensation is to continue at a reduced rate if he refuses treatment indicated by a myelogram.

Summarizing the result in this first point, we affirm the reduction of compensation based on plaintiff's refusal of a myelogram. If, however, plaintiff submits himself to a myelogram, compensation based on a temporary total disability is to be restored until there is a judicial determination that plaintiff unreasonably and arbitrarily refuses treatment indicated by the myelogram result. In such a determination, any treatment indicated must be measured against the standard set forth in Fowler v. W. G. Const. Co., supra.

*A gap in compensation benefits.*

■ Defendants paid compensation benefits to August 3, 1971. The trial court found that plaintiff "has suffered and is suffering a total temporary disability of the body as a whole." It ruled that compensation, based on a total temporary disability, was to be resumed upon entry of judgment. Judgment was entered April 25, 1973.

No express reference is made in either the trial court's decision or the judgment concerning compensation benefits for the period of August 3, 1971, to April 25, 1973. Plaintiff contends he is entitled to maximum compensation benefits for this period of time because of the trial court's finding of temporary total disability. He relies on § 59–10–16, N.M.S.A. 1953 (Repl.Vol. 9, pt. 1) which provides that a judgment in a workmen's compensation case is to include a sum "for the amount then due."

The difficulty with plaintiff's position is that the trial court refused his requested conclusion of law that plaintiff was entitled to "accrued workmen's compensation benefits from August 3, 1971, to the date of final judgment herein."

Defendants defend the gap in compensation benefits on the basis that the trial court intended to deny all compensation benefits for the time period covered by the gap. They assert denial of compensation benefits for this period of time is supported by the finding that plaintiff "has refused and refuses" the myelogram and treatment indicated by a myelogram.

There are two difficulties with defendants' contention. First, if the finding as to the refusal of medical treatment applies to the time period of the gap, then by the wording of that finding, plaintiff would be entitled to benefits based on fifteen percent (15%) of the body as a whole. Second, the trial court refused defendants' request to find that because of plaintiff's refusal to submit to treatment the trial court "should suspend any compensation." .

This is not a case where, by construction of findings made, the trial court's judgment can be justified. H. T. Coker Const. Co. v. Whitfield Transp., Inc., 85 N.M. 802, 518 P.2d 782 (Ct.App.1974). In this case, although requested to do so, the trial court has failed to find one way or another on compensation to be paid during the time period involved in the gap. Accordingly, the cause must be remanded for a finding on compensation, if any, payable to plaintiff during this time period. Geeslin v. Goodno, Inc., 75 N.M. 174, 402 P.2d 156 (1965); see Aguayo v. Village of Chama, 79 N.M. 729, 449 P.2d 331 (1969).

*Cost of deposition.*

■■ Eight days prior to trial plaintiff moved for permission to take the deposition of his treating physician, Dr. Santoscoy, alleging that the physician was not a resident of New Mexico; that a prior deposition of this physician had been taken almost a year previously; and, that the deposition was necessary for the presentation of the physician's testimony as to plaintiff's current condition.

The trial court authorized the deposition. In doing so, it provided:

". . . that if the testimony of said doctor shall reveal no change in his physical condition from the date of the taking of his deposition in December, 1971, all costs of said deposition shall be borne by the Plaintiff, the provision of the Workmen's Compensation Act notwithstanding."

After this second deposition was read into evidence at trial, the trial court ruled that plaintiff should bear the cost of the deposition. Plaintiff asserts this ruling was improper under § 59–10–13.9, N.M.S. A. 1953 (Repl. Vol. 9, pt. 1). We agree.

The trial court had no authority to order plaintiff to pay the cost of the deposition, "the provision of the Workmen's Compensation Act notwithstanding." Section 59–10–13.9, supra, states that when the provisions of the Workmen's Compensation Act directly conflict with the rules of civil procedure, the provisions of the Workmen's Compensation Act govern. Section 59–10–13.9, supra, contains express provisions concerning the cost of depositions in compensation cases. These express provisions directly conflict with any discretion in the trial court concerning cost of depositions under the rules of civil procedure.

Section 59–10–13.9, supra, provides that depositions in compensation cases are to be authorized only after the trial court finds "that good cause exists, that the evidence to be obtained will probably be material to the issues of the cause and the court enters an order authorizing the same."

Defendants contend the requirement that plaintiff pay the cost of the second deposition is proper because plaintiff failed to show "good cause" for the deposition. The answer is that if "good cause" was not shown, the trial court should not have authorized the deposition.

The trial court's reason for its ruling is stated in a letter opinion to counsel. It pointed out that in the deposition the physician testified to "no change" in plaintiff's condition and this information could have been obtained by either a telephone conversation or by an exchange of correspon-

dence. This reasoning is fallacious. Plaintiff's condition since the prior deposition was material to the issue of plaintiff's disablility for the time subsequent to the prior deposition. Mares v. City of Clovis, 79 N.M. 759, 449 P.2d 667 (Ct.App. 1968). There is nothing indicating how this material evidence could be presented at trial through hearsay telephone conversations or correspondence between plaintiff's attorney and the physician.

Section 59–10–13.9, supra, states: "The cost and expense of any . . . deposition ordered by the court shall be paid by the defendants." The trial court's ruling violated this express statutory provision. The portion of the judgment ordering plaintiff to bear the cost of the second deposition is reversed and the trial court is directed to enter a new judgment requiring defendants to bear the cost of that deposition.

*Reexamination of plaintiff and doctor-patient privilege.*

█ Dr. Gingrich examined and evaluated plaintiff at the request of plaintiff's attorney. This attorney withdrew from the case at an early stage. Defendants deposed Dr. Gingrich.

Subsequently, defendants moved that plaintiff be required to submit to a second examination and evaluation. The examination was ordered by the trial court. Dr. Gingrich testified at trial over plaintiff's objection.

Plaintiff contends the reexamination and reevaluation by Dr. Gingrich was improperly authorized by the trial court because plaintiff's attorneys at trial were involved in a medical malpractice action against the doctor. The answer is that § 59–10–20(5), supra, authorizes reexaminations "after reasonable cause shown." The record does not show the trial court abused its discretion in ordering the reexamination.

█ Plaintiff also contends Dr. Gingrich's testimony was not admissible at trial because of the provisions of § 20–1–12(d), N.M.S.A. 1953 (Repl. Vol. 4), as that section was worded prior to its amendment by Laws 1973, ch. 223, § 1. Plaintiff's claim is based on statutory language which limits examination of a doctor employed by a workmen's compensation claimant. See Williams v. City of Gallup, 77 N.M. 286, 421 P.2d 804 (1966); State ex rel. Miller v. Tackett, 68 N.M. 318, 361 P.2d 724 (1961).

Section 20–1–12(d), supra, was not applicable. The record indicates defendants sought and paid for the reexamination. The record also shows that plaintiff took the position that he did not incur any bill with Dr. Gingrich in connection with the reexamination and opposed even transmitting defendants' payment check to the doctor. In these circumstances, the following provision in § 59–10–20, supra, controls:

> · "Any physician selected by the employer and paid by the employer who shall make or be present at an examination of the claimant conducted in pursuance of this section may be required to testify as to the conduct thereof the findings made [sic]. Communications made by the claimant upon such examination to such physician . . . shall not be considered privileged."

*Attorney fees.*

█ Plaintiff's attack on the award of attorney fees has two aspects—(1) the amount awarded and (2) limitation upon payment of the amount.

1. The amount awarded.

The amount awarded was $1500.00. In claiming this was inadequate, plaintiff refers us to the number of depositions taken, the length of trial and numerous other matters including a "void and vexatious contempt hearing." Plaintiff's position is that the trial court failed to exercise its discretion in determining the size of the award.

The applicable statute, § 59–10–23(D), N.M.S.A. 1953 (Repl. Vol. 9, pt. 1) authorizes the trial court to set attorney fees which are reasonable and proper. The amount of the award is discretionary with

**474**

the trial court. In exercising that discretion, the trial court must consider the mandatory provisions of § 59–10–23(D), supra. Keyser v. Research Cottrell Company, 84 N.M. 173, 500 P.2d 997 (Ct.App. 1972). The amount awarded is reviewable only for an abuse of discretion. Adams v. Loffland Brothers Drilling Company, 82 N.M. 72, 475 P.2d 466 (Ct.App. 1970).

 The record shows settlement offers made to plaintiff both before suit was filed and prior to trial. There is nothing showing the trial court failed to consider the mandatory provisions of § 59–10–23(D), supra.

As to the nonmandatory items relied on by plaintiff, these matters were presented to the trial court by motion on January 3, 1973. The trial court's letter opinion setting the $1500.00 amount is dated March 20, 1973. We cannot say, as a matter of law, that the trial court failed to consider plaintiff's motion or that it failed to give proper weight, under the law, to the items listed in the motion. We need not determine which of the items relied on could be properly considered on the question of attorney fees because the record does not show the trial court abused its discretion in its award.

2. Limitation upon payment of the award.

The pleadings indicate that the relations between the attorneys in this case were less than amicable. Defense counsel filed several motions seeking "sanctions" against plaintiff's attorneys. After an incident at the office of Dr. Gingrich, the trial court issued its order directing plaintiff and Attorney Anderson to show cause why they should not be held in contempt. The New Mexico Supreme Court designated Judge Zimmerman to preside at the hearing on the order to show cause.

Judge Zimmerman's decision provides that if attorney fees were awarded in the compensation case they were to be paid to the Clerk of the District Court. The Clerk was to deduct the cost of depositions and disburse the cost to the party paying the deposition expense. This was an obvious financial benefit to defendants. After deposition costs were paid the balance was to be transmitted to the Treasurer of New Mexico. Judge Burks directed that his award of attorney fees was to be paid in accordance with Judge Zimmerman's decision.

Serious questions exist as to the validity of Judge Zimmerman's decision, both as to the nature of the penalty imposed and the fund from which the penalty was to be paid. We do not reach these questions because of a jurisdictional problem.

 The Supreme Court's designation of Judge Zimmerman to preside at the hearing on the order to show cause issued by Judge Burks, vested Judge Zimmerman with the same power as that possessed by Judge Burks. Ravany v. Equit. Etc. Soc., 26 N.M. 41, 188 P. 1106 (1920).

 Judge Burks' order to show cause was issued after several motions of defendants' attorney seeking to have sanctions imposed upon plaintiff's attorneys. Not one of these motions was under oath. Judge Burks' order requiring plaintiff and Attorney Anderson to show cause why they should not be held in contempt was not based on a sworn pleading or upon sworn testimony before Judge Burks. The asserted factual basis for the order to show cause did not occur in the presence of the court.

Absent a sworn statement, the order to show cause was a nullity, and Judge Burks had no authority to proceed in the matter. State v. Clark, 56 N.M. 123, 241 P.2d 328 (1952); Momsen-Dunnegan-Ryan Co. v. Placer Syndicate Mining Co., 41 N.M. 525, 71 P.2d 1034 (1937); Nunn v. Sikes, 28 N.M. 628, 216 P. 493 (1923); In re Fullen, 17 N.M. 394, 128 P. 64 (1912). Judge Zimmerman, having the same power as Judge Burks, was also without jurisiction.

The limitation upon payment of the amount awarded by the trial court as attorney fees is reversed.

■ Plaintiff has been successful in removing a limitation upon compensation benefits and has been successful in requiring a remand for a decision concerning compensation benefits from the time compensation was terminated until the date of entry of judgment. These two successes have not at this point increased his compensation. Accordingly, we do not award attorney fees, in this appeal, for these two items.

Plaintiff has successfully upset the requirement that he pay for Dr. Santoscoy's second deposition and upset the limitation upon payment of the attorney fees awarded by the trial court. This results in a financial benefit to plaintiff. Plaintiff is awarded attorney fees in the amount of $1500.00 for the services of his attorneys on appeal for these items. Brannon v. Well Units, Inc., 82 N.M. 253, 479 P.2d 533 (Ct. App. 1970).

The cause is remanded for correction of the trial court's judgment and for further proceedings consistent with this opinion.

It is so ordered.

HERNANDEZ, J., concurs.

SUTIN, J., dissenting in part and concurring in part.

SUTIN, Judge (dissenting in part and concurring in part).

I dissent on the issue of "refusal of medical services," and concur on the remainder of the opinion.

A. *The trial court had a duty to make additional findings on refusal to allow a review.*

Section 59–10–20, N.M.S.A. 1953 (Repl. Vol. 9, pt. 1) provides in part:

If any workman . . . shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, the court may in its discretion reduce or suspend his compensation.

Before the court can exercise its discretion, it must find that the workman's refusal was arbitrary and unreasonable. The court must also find that the medical or surgical treatment is one which a person of ordinary prudence and courage would undergo for his own betterment regardless of compensation. "These are questions of fact to be determined by the trial court before there is anything for review by an appellate court." Rhodes v. Cottle Construction Company, 68 N.M. 18, 23, 357 P.2d 672, 676 (1960); Helms v. New Mexico Ore Processing Co., 50 N.M. 243, 248, 175 P.2d 395 (1946); Gillam v. Workmen's Compensation Appeal Board, 118 W.Va. 571, 191 S.E. 204 (1937).

The trial court made no such findings. This case should be reversed with instructions to the trial court to make the following additional findings:

First, whether the plaintiff arbitrarily and unreasonably refused to submit to a myelogram.

Second, whether a myelogram is one which a person of ordinary prudence and courage would undergo for his betterment regardless of compensation.

With reference to the first finding, what is meant by an arbitrary *and* unreasonable refusal by a workman to submit to a myelogram? Minor or major surgery is not relevant. We are concerned with whether a myelogram is reasonably essential to promote plaintiff's recovery from an injury to the low back area.

"Arbitrary" means "arising from unrestrained exercise of the will, caprice, or personal preference". "Unreasonable" means "not governed by or acting according to reason: evincing indifference to reality or appropriate conduct: ill regulated in behavior: not conformable to reason: absurd". Webster's Third New International Dictionary, Unabridged (1966), pp. 110, 2507, respectively; Harris v. State Corporation Commission, 46 N.M. 352, 360, 129 P.2d 323 (1942).

For purposes of guidance, a brief review of some evidence shows that plaintiff was 50 years of age, a common laborer with a seventh grade education. He discussed a myelogram with Dr. Kauffmann, a neurosurgeon. Dr. Kauffmann said he would give plaintiff a myelogram if plaintiff wanted it. Plaintiff had told the doctor that he had a lot of difficulty with the first myelogram. Dr. Kauffmann said this was credible because myelography was not completely deviod of pain. It's a painful test. Plaintiff knew what the doctor was talking about. The doctor understood plaintiff did not feel this second myelogram was warranted, or plaintiff was pathologically scared of the test itself. Plaintiff testified:

> If they recommend me a myelogram, and operate on me, provided they guarantee that I will come out successful, I will consent. Otherwise nothing doing.
>
> * * *
>
> I told the doctor, as I tell you, that without putting me to sleep; nothing doing.

Dr. Kauffmann also testified that myelography has no therapeutic value or any curative effects. "Therapeutic" means "of or relating to the treatment of disease or disorders by remedial agents or methods". Webster's, supra, p. 2372. This can be interpreted to mean that plaintiff refused a type of medical treatment that has no value.

Was plaintiff's refusal arbitrary, unreasonable, capricious? Was it a whim, a fancy, stupid, unwise, silly?

Under similar circumstances, it has been held that a claimant's refusal to submit to another operation is unreasonable. Dudley v. Ferguson Trucking Company, 61 N.M. 166, 172, 297 P.2d 313 (1956). If an orthopedic specialist does not advise or suggest that a myelogram be given, it is not unreasonable to refuse. Wood v. Industrial Commission, 13 Ariz.App. 449, 477 P.2d 568 (1970). See also, Ripp v. Maryland Casualty Company, 221 So.2d 899 (La. App.1969); Sultan & Chera Corp. v. Fallas, 59 So.2d 535 (Fla.1952); Hartford Acc. & Indemnity Co. v. Barfield, 89 Ga. App. 562, 80 S.E.2d 84 (1954); Bostic v. Dreher, 206 Pa.Super. 257, 213 A.2d 118 (1965).

For medical malpractice in myelography, see Toal v. United States, 306 F.Supp. 1063 (D.Conn.1969).

With reference to the second finding, no suggestions are neccessary to advise a trial court of the meaning of a person of ordinary prudence and courage.

For the above reasons, I dissent.

B. *Concurrence in remainder of majority opinion.*

I concur in the remainder of the majority opinion.

C. *Caution on briefs.*

For lawyers who read dissenting opinions and appeal, I want to ipse dixit on the writings of briefs. In the present case, plaintiff's brief was 60 pages. Defendants' brief was 90 pages with an extensive appendix. Such briefs are burdensome on courts of review. They are a festivity of words.

Under Rule 9(K) (4) of the New Rules Governing Appeals to the Supreme Court and Court of Appeals, effective April 1, 1974, the argument and authorities *"shall not exceed thirty-five typewritten pages unless leave of court is obtained."* [Emphasis added].

If lawyers do not file briefs in accordance with these rules, they will be compelled to rewrite them.