297 P.2d 313

James B. DUDLEY, Claimant-Appellee,

v.

FERGUSON TRUCKING COMPANY, a Corporation, Employer,

and

Travelers Insurance Company, Insurer, Defendants-Appellants.

No. 5934.

Supreme Court of New Mexico.

May 15, 1956.

Hubert O. Robertson, Silver City, for appellants.

Garland & Sanders, James T. Martin, Jr., Las Cruces, for appellee.

McGHEE, Justice.

The defendants, employer and insurer, appeal from a judgment of the district court awarding claimant, employee, workmen's compensation benefits.

Claimant sustained a compensable injury when he was helping to load oil well drilling equipment on a truck. A drill collar rolled off a flat bed and struck his right foot. It was necessary that the great toe on this foot be amputated through the proximal portion of the first phalanx. Claimant was hospitalized at Farmington, New Mexico, in excess of two and one-half months, during which time four operations were performed on his foot. The insurer paid for the medical and hospital expense involved and also paid $392.29 for the period of time of claimant's temporary total disability. After claimant's release from

the hospital he moved to Deming, New Mexico, where he commenced work on his brother's farm.

The insurer sent claimant a check for $450 for settlement of his compensation on the basis of loss of the great toe. Claimant refused this settlement and thereafter he was examined by Dr. W. C. Basom, an orthopedic specialist in El Paso, Texas, whose medical report, communicated to the defendant insurer by claimant's attorney, indicated further surgical treatment would probably improve the condition of claimant's foot. The insurer again offered $450 in settlement for the loss of the toe plus $300 for future medical expense and loss of time. This offer, too, was refused by claimant and suit by him was then instituted.

Trial was had to the court which found claimant entitled to compensation at the rate of $30 per week for (a) fifteen weeks for the loss of his great toe, and (b) twenty-five weeks for twenty-five percent permanent disability to his right foot, and, in addition, that he should recover:

(1) $400.00 for necessary medical treatment which will be required in the future;

(2) Four weeks' compensation for temporary total disability incurred in the future as a result of additional medical treatment;

(3) $55 for a specially built boot purchased by claimant;

(4) $34 for medical services rendered by the El Paso doctor;

(5) $350 for services of claimant's attorney.

Judgment was entered making these awards.

■ The defendants maintain on this appeal that the judgment improperly pyramids the benefits allowed to claimant in that he was allowed compensation for the loss of the great toe on his right foot and also for twenty-five percent permanent disability to the right foot. Principal reliance is placed upon the decision in Gonzales v. Pecos Valley Packing Co., 1944, 48 N.M. 185, 146 P.2d 1017. That case held a workman could not recover an award for loss of a specific bodily member under the statutory schedule and also an award for general percentage disability which, as the Court assessed the proof in that case, was necessarily based upon the loss of member.

Superficially, it would appear that the instant awards do allow claimant double compensation, upon the assumption that the loss of claimant's toe must have at least entered into the computation of disability to the foot. However, the medical testimony, viewed most favorably as to claimant-appellee, and bolstered by all reasonable inferences flowing therefrom, seems to us adequate to support the permissibility of both awards.

Dr. Basom's testimony, by deposition, was, in part:

"Q. Please state what your examination revealed? A. That he had

post-traumatic artrophy and amputations and post-traumatic sesamoiditis and stiffness in the second toe.

"Q. Doctor, would you explain in layman's language what that means? A. This patient had the great toe amputated, more or less totally. Then the remaining part of it and at the end of the bone which connects with the great toe was a very roughened area due to the injury. Then the two small bones called sesamoids were also roughened and made a painful condition in the patient's foot.

"Q. These bones you referred to then, are they primarily in the arch of the foot? A. These bones are located within the phalanges of the foot and along the metatarsal toe region. This is the place—see, here is a little bit of the great toe remaining—here is the joint and here is the second sesamoids. He had a bread (sic) right through there.

"Q. Doctor, you are referring to an x-ray there, and is that x-ray a picture you took of Mr. Dudley's foot? A. Yes, it was taken in our office.

"Q. From your examination, can you estimate the disability, if any, which he has in his foot? A. He has a definite amount of permanent disability to his foot. I would estimate about twenty-five percent.

\*    \*    \*    \*    \*    \*

"Q. The disability you have testified to—to what portion of the foot are you referring? A. The disability is located in the forepart of the foot just above where the toes join on to the foot.

"Q. The estimate of disability you had made—a moment ago—does that include the loss of the great toe? A. On what the patient has at the present time. I did, however, assume that the toe, of course, was gone.

\*    \*    \*    \*    \*    \*

"Q. Doctor, in the report which I received from you, you stated there was moderate osteoporosis—would you explain what that is? A. The bones in this patient's foot are very soft. They are not as strong as they normally should be. They are not as white in the x-ray as they are normally seen, and this is a painful condition.

"Q. Did you find osteoporosis present in Mr. Dudley's foot? A. Yes, he had a definite amount. I referred to it as post-traumatic, which is practically the same.

"Q. Is that condition a result of this injury? A. Yes sir.

"(The doctor continued on cross examination:)

\*    \*    \*    \*    \*    \*

"Q. What factors did you take into consideration in arriving at your esti-

mate of twenty-five percent disability? A. Mine is mainly based on the estimate of how much the foot falls short of being a normal one. The loss of the toe and the involvement in the forefoot area with the pain, were the basis of the estimate. Of course, pain is a very difficult thing to estimate. It was my impression this was about ¾ths as good as a normal foot.

"Q. You did consider the loss of the great toe as one of the factors in arriving at that estimate? A. Well, the toe—and of course the second toe had some disability, too. All of that actually would be included in my twenty-five percent estimate.

"Q. If there had been no involvement of the second toe, no painful scar tissue, roughening of the sesamoids, or fragment of the first great toe phalanx—leaving out those conditions, how much disability would you have estimated just from the loss of the great toe? A. Actually, just the loss of a great toe is merely loss concerned with a toe, and I don't think it would particularly enter into a foot estimate.

"Q. Did I understand, however, that in reaching your estimate, you did lump the loss of the great toe in these other factors in reaching your result? A. I merely estimated the disability as a whole on the foot.

"Q. How much of that twenty-five percent was due to involvement of other parts of the forefoot and how much simply to the loss of the toe? A. I don't think the loss of the great toe enters into the twenty-five percent particularly. The forefoot disability ratings are based on conditions in the forefoot. The toe amputation is a separate proposition if you want to make an issue of that. If you want the man to have an estimate of amputation, there is separate disability for amputation of the great toe. The disability to the forefoot is a disability rating based on conditions in the forefoot and like I say—I made just an estimate of the full disability rating. I just included the toe as part of it. I didn't even put any added disability rating on for the toe loss.

"Q. Would you be able to evaluate the percentage of the loss or usefulness of the entire foot which would be caused by a clean amputation of the great toe without any further disability to the foot? A. I think what you are driving at is actually—I don't think the loss of a great toe is any particular disability rating for the whole foot.

"Q. Do you mean from a legal aspect or from a medical aspect? A. No, I mean medical. In other words, whenever it is an amputated toe by itself, I just call it an amputated toe with no disability rate to the foot.

"Q. Doesn't the loss of any toe affect the usefulness of the whole foot? A. I don't really think so."

Claimant, in his answer brief, asserts: "From this testimony it is quite apparent that Dr. Basom concluded that there were two separate and distinct injuries, one being to the forepart of the foot and the other being the amputation of the great toe." We believe the fact finder was justified in so interpreting this testimony.

It should also be noted that the claimant exhibited his foot to the court, pointing out the parts involved, at which time he testified:

"Q. I will ask you to take off your boot and show to the Court the injury which you sustained?

"Mr. Robertson: We object. It is not material. It is immaterial, incompetent and irrelevant in this case. This is a compensation case.

"(Argument.)

"The Court: I will overrule the objection.

"Q. Would you point out the part of your foot that is still giving you trouble? A. Right in here, and these toes. They are stiff.

"The Court: Are those toes stiff? A. Yes, sir.

"Q. I notice that wound there doesn't appear to be healed. Has it healed to the extent—

"Mr. Robertson: I object to that line of comment and argument.

"The Court: Has that healed? A. No, sir.

"Mr. Martin: I think that's all.

"The Court: Does your foot bother you on the bottom? A. Yes, sir, this bone in here. When there is pressure pushed on this, it pushes those bones up there and aches across here and this, too. I tried to have something made that keeps that toe from hurting. It won't touch the floor when I step down. My toe is sticking up instead of like it should be."

There was substantial evidence before the court that claimant sustained an injury which extended beyond his toe. The testimony given by Dr. Basom may fairly be interpreted that he did not include the loss of the toe in his computation of disability to the foot. As a result of these particular circumstances, this case falls within the principle of our decisions in Mathews v. New Mexico Light & Power Co., 1942, 46 N.M. 118, 122 P.2d 410, and Lipe v. Bradbury, 1945, 49 N.M. 4, 154 P.2d 1000. Similar allowances have been approved in these cases from other states: General Accident, Fire & Life Assur. Corp. v. Beatty, 1932, 174 Ga. 314, 162 S.E. 668; Lane v. Sonken-Galamba Corp., 1925, 119 Kan. 256, 237 P. 875; Fame Armstrong Laundry Co. v. Brooks, 1928, 226 Ky. 22, 10 S.W.2d 478; Lentz v. Mumy Well Service, 1954, 340 Mich. 1, 64 N.W.2d 673.

■ Defendants under their second point protest that the trial court has allowed an award of compensation for permanent partial disability before an end medical result has been reached. This argument is based upon the medical testimony in the case that claimant's condition would be benefited by a further operation; that claimant has refused at this time to undergo such operation; and that under § 59–10–20, N.M.S.A. 1953, it is in the discretion of the court to reduce or suspend compensation if the workman shall refuse to submit to medical or surgical treatment as is reasonably essential to promote his recovery. As here material, this section provides:

"If any workman shall persist in any unsanitary or injurious practice which tends to imperil, retard or impair his recovery or increase his disability or shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, the court may in its discretion reduce or suspend his compensation."

While the doctors testifying were of the opinion further surgery would eliminate part of claimant's disability, there was other testimony, already noted above, that claimant had present permanent partial disability in his foot which Dr. Basom estimated at twenty-five percent.

Claimant's testimony about the further operation was:

"Q. Do you want an operation? A. No sir. I have had four and I don't want another. If it gets worse, I will. They told me they would help me every time they operated, but it never seemed to, and I have had four of them. If it gets worse I will have one—if it stays like it is, I won't.

"Court: Then as I understand, you don't want an operation at this time, is that correct? A. No sir. If it stays like it is, I am satisfied. It will be all right."

It cannot be said that claimant's refusal to submit to another operation is unreasonable and the court's finding of present permanent partial disability is supported by substantial evidence.

■ This brings us, however, to another matter objected to by defendants—that is, the allowance to claimant of $400, the estimated cost of further surgical treatment and four weeks' compensation for temporary disability to be incurred in the future as a result of additional medical treatment. We agree with defendants that our Workmen's Compensation Act contains neither authorization nor suggestion for a present award of future medical expenses and temporary disability benefits where the claimant refuses the present administration of such treatment and it is only speculative whether the treatment will ever be undertaken in the future. Our statute, § 59–10–19, N.M.S.A. 1953, provides, in part:

"After injury, and continuing so long as medical or surgical attention

is reasonably necessary, the employer shall furnish all reasonable surgical medical, osteopathic, chiropractic and hospital services and medicine, not to exceed the sum of seven hundred dollars ($700.00), unless the workman refuses to allow them to be furnished by the employer, provided nevertheless: In the event hospital, medical and surgical attention is necessary, in excess of the above sum and the employer refuses to furnish the same, the employee may make application to the district court for an order requiring the employer to furnish such additional hospital, medical, and surgical services as may be found by the court to be reasonably necessary to fully and completely care for the employee.

"Such application shall be informal in character and filed as claims under this act are filed. * * *

"Upon * * * hearing the court shall inquire into the necessity of such additional services and the reasonableness of the cost thereof and shall order such additional services to be paid by the employer or his insurer as the equity of the hearing demands, it being the intention hereof that the employee shall receive all such hospital, medical and surgical treatment and services as may appear to the court to be reasonably necessary."

The defendants have already expended $1,390.06 for claimant's medical treatment; claimant has never requested further medical treatment; instead, he presently refuses it and has been given an award for permanent partial disability based upon his present condition. In this situation, the award made for possible future medical treatment and temporary disability has no justification under the statute.

■ Claimant, as already stated, was awarded $55 for a specially built boot which he purchased. The defendants challenge the validity of this allowance, as well as an award of $34 given claimant for expense of an examination of his condition made by Dr. Basom. The trial court found the plaintiff was required to wear a specially constructed boot by reason of his injury and that the boot cost $55, that he had received medical services from Dr. Basom and the latter's fee of $34 was reasonable for the examination.

The record discloses that on his own initiative claimant ordered a pair of cowboy boots made for him at a boot and saddle shop in El Paso, Texas, but at no time did he ever notify defendants in any manner of his need of or desire for special shoes or boots, or for any further medical treatment after he left the care of the doctors and hospital in Farmington, except, as already stated, that Dr. Basom's medical report was sent to the defendant insurer by claimant's attorney.

In addition to portions of § 59–10–19, supra, already set forth, it is there provided:

"In case the employer has made provisions for, and has at the service of the workman at the time of the accident, adequate surgical, hospital and medical facilities and attention, and offers to furnish such during the period necessary, then the employer shall be under no obligation to furnish additional surgical, medical or hospital services or medicine than those so provided; * * *."

It is apparently the contention of the claimant that under our compensation act to support the award of the sums for the boot and the medical examination he need only show the expenditures were justified from a medical standpoint and were of reasonable amount.

Certainly these matters must be shown, but it must also be established that some request or demand, however informal, was made upon the employer or insurer to provide the articles or services. We note in this connection the following language from George v. Miller & Smith, Inc., 1950 54 N.M. 210, 213, 219 P.2d 285, 286:

"All medical expenses had been paid by the defendants up to February 7, 1948 the date when the injured workman returned to his regular employment. The record discloses that when the plaintiff filed his claim for compensation on February 24, 1949, he did not at that time claim any additional expenses for medical care. He did, however, on October 12, 1949, file a statement from Dr. Thomas L. Gore, for neuro-psychiatric examination and treatment rendered the plaintiff, from February to August 1949. He did not request additional medical treatment from his employer nor did he apply to the district court for an order requiring the employer to furnish such additional services as required by Section 57–919 of 1941 Compilation [§ 59–10–19, N.M.S.A. 1953]. Consequently, it is apparent that the statute had not been complied with. This is a special proceeding and additional medical services are to be paid by the employer and his insurer only under the terms of the statute. If the terms of the statute relating to such payments have not been met, then, of course, the court cannot order the payment therefor."

See also: Wright v. Schultz, 1951, 55 N.M. 261, 265, 231 P.2d 937; Rowland v. Reynolds Electrical Engineering Co., 1951,

55 N. M. 287, 294, 232 P.2d 689. This is the general rule under statutory provisions similar to ours. 2 Larson, Workmen's Compensation Law, § 61.12; Annotation: 7 A.L.R. 545.

In view of our determination the awards made to claimant for compensation for loss of his great toe and partial disability to his foot should stand, we must reject defendants' final contention on this appeal that they had offered claimant all the compensation to which he was entitled and that an award of attorney's fees in the sum of $350 by the trial court was improper. Claimant's attorneys will be allowed $200 for their services in this Court.

The judgment is reversed and remanded with direction to the trial court to enter judgment in favor of claimant for compensation at the rate of $30 per week for (a) fifteen weeks for loss of the great toe and (b) twenty-five weeks for twenty-five percent permanent partial disability in the right foot, and for attorneys' fees as directed herein.

It is so ordered.

COMPTON, C. J., and LUJAN and SADLER, JJ., concur.

KIKER, J., not participating.