871 P.2d 1

Jonathan RAEL, Worker/Appellant,

v.

WAL–MART STORES, INC. and National Union Fire Insurance Company, Employer/Insurer/Appellees.

No. 14749.

Court of Appeals of New Mexico.

Feb. 2, 1994.

Certiorari Denied March 11, 1994.

Randi McGinn, Paul DeMuro, Randi McGinn & Associates, Albuquerque, for worker/appellant.

Robert A. Martin, Bradley & McCulloch, P.A., Albuquerque, for employer/insurer/appellees.

## OPINION

BLACK, Judge.

Jonathan Rael ("Worker") injured his back and herniated two discs in an on-the-job accident. Worker's back did not improve and his doctor, Peter Stern, M.D., proposed a discogram and excision of the abnormal discs. Worker decided against surgery. Dr. Stern then prepared a report indicating that, in the absence of surgery, Worker had reached maximum medical improvement ("MMI"). At the hearing on the merits, the record indicated Worker had a physical impairment rating of 18% and the Worker's Compensation Judge ("WCJ") calculated compensation to be 26%, pursuant to the Workers' Compensation Act of 1990, NMSA 1978, Sections 52–1–1 through 52–10–1 (Repl.Pamp.1991) ("the Fourth Act"). Worker argues the WCJ erred in his interpretation and application of Section 52–1–24.1 (maximum medical improvement) and Section 52–1–51(I) (effective January 1, 1991) (refusal of medical treatment) of the Fourth Act. We disagree and affirm.

## MAXIMUM MEDICAL IMPROVEMENT

■ Worker argues that the WCJ erred in finding Worker had reached MMI on February 10, 1992. Worker relies on Dr. Stern's testimony that Worker's condition without surgery would probably disintegrate to the extent that he could not bear the pain and then would elect to have the surgery, to support his argument that he cannot be found to have reached MMI prior to the time he decides to have surgery. We disagree. Such an interpretation of the Act would allow a worker to choose the pace of medical treatment designed to produce MMI. We do not believe the Legislature contemplated granting a worker control over scheduling when he will achieve MMI, and the resulting reevaluation of total disability. *Cf.* § 52–1–26(A) (every worker who suffers compensable injury "should be provided with the opportunity to return to gainful employment as soon as possible with minimal dependence on compensation awards").

As a part of the Fourth Act, the Legislature adopted the following definition of MMI:

[The] "date of maximum medical improvement" means the date after which further recovery from or lasting improvement to an injury can no longer be reasonably anticipated based upon reasonable medical probability as determined by a health care provider defined in Subsection C, E or G of Section 52–4–1 NMSA 1978.

Section 52–1–24.1. Based on this statute, we agree with Worker's counsel that "[t]he sole inquiry is whether there is a probability of further recovery or lasting medical improvement." However, reasonable medical probability can only be given in reference to a definable period of time. Dr. Stern's testimony in response to his understanding of the meaning of the term "maximum medical improvement" is enlightening in this regard:

A   I think the legal profession asks us doctors to say, "Doctor, is this patient as good as he's going to get in this particular time frame." And that's what I understand maximum medical improvement to mean. It's a useful concept for clearing litigation and for awarding damages. And I subscribe to it in the sense that if I'm asked is this patient as good as he's going to be, at this point in time, and for the foreseeable one to three years, if I feel that is the case, I will say the patient is at maximum medical improvement.

Q   As I understand your definition of maximum medical improvement, does that mean that he's reached a plateau in his treatment and won't get better or worse over the next year to three years?

A   I think it is a judgment call. I don't think much will happen in an individual who is at maximum medical improvement. He may have variation from week to week but, generally, the impairment percentage won't change. That's the best. And we're betting, to some extent, on chance because, certainly, any individual can turn quickly in response to his name and, at the same time, sneeze and at the same time find himself holding a pail of water because his helper abandoned him and his disc could slip out much more. And that could be three days after a respected orthopedic surgeon says an individual is at maximum medical improvement. So, what we're really saying is, the chances are that a given patient will be about like as he was now, which I think in the context of maximum medical improvement means a year or two.

We cannot say Dr. Stern's understanding is inconsistent with the definition of MMI contained in Section 52–1–24.1. Dr. Stern testified that, without surgery, Worker had reached MMI as of February 10, 1992. This is sufficient basis for the WCJ's conclusion that Worker had reached MMI as of that date.

■ Worker further argues that Dr. Stern testified that Worker is likely to receive lasting improvement from three forms of nonsurgical treatment. We do not believe that Dr. Stern's testimony, taken as a whole, supports such a conclusion. It is certainly true Dr. Stern recognized that "a fitness program would likely improve [Worker's] situation and decrease his percentage of impairment." However, Dr. Stern was realistic about the

potential for a patient like Worker to successfully complete such a fitness program. He testified, for example:

A I'm talking about fitness where he becomes a conditioned individual either through bicycling, water aerobics, step aerobics or aerobic dancing with rapid walking. I would not recommend long-distance running for this individual. I'm talking about a fitness program where he trims his fat down, increases his percentage of musculature and leanness and builds muscle around his trunk and abdomen so that things stay in place, so to speak.

In our experience, if you can get an individual who is not fit to become fit, athletically fit, the results are quite encouraging. But it takes a lot of work and a lot of cooperation on the part of the patient. Here's an individual with low back problems and we're telling him, "We want you to exercise more, do this and this." Sometimes it's just not possible. The patients hurt too much to do sit-ups. They cannot bicycle. If they walk for more than 10 or 15 minutes, they have pain. But, in the best of all situations, when you can get someone fit, the pain perception decreases. Their tolerance of such conditions, as we talked about, increases.

Q Is that something you recommend Mr. Rael try?

A It's worth a try.

If anything, this testimony reinforces Dr. Stern's conclusion that MMI is not a totally static concept. If Worker should successfully engage in such physical conditioning, it may affect Dr. Stern's conclusion that Worker will probably choose surgery within the next five to ten years and it could also lead to Employer filing a motion to decrease benefits. However, as Employer points out, even under the best scenario, including surgery, Dr. Stern estimated Worker's physical impairment is only likely to decrease from 18% to 14% and Worker would still probably only be able to engage in the same type of medium-duty employment for which Dr. Stern previously provided a release. Therefore, the fact that the physician supervising Work-

er's fitness program had not released Worker to return to work as of February 10, 1992 does not invalidate the foundation for the WCJ's finding.

### REFUSAL OF MEDICAL TREATMENT

██ Worker argues that Employer reduced Worker's benefits even though his refusal of surgery was reasonable and this was, in effect, affirmed by the WCJ. Worker points out that since Dr. Stern could not say it was unreasonable for Worker to refuse surgery, the WCJ could not penalize Worker by discontinuing his total disability. Although neither Employer nor the WCJ invoked this penalty, Worker chooses to characterize the decision on appeal as requiring a Hobson's choice: "Have surgery or starve." Again, we disagree.

We believe Worker is confusing the penalty provided in Section 52–1–51(I) (effective Jan. 1, 1991) with the need for judicial finality based on medical evidence. As indicated, the determination of MMI is based upon a medical decision made by Dr. Stern, who also released Worker to return to medium-duty work. It is true that Dr. Stern testified that if Worker had undergone the proposed surgery, he would likely have remained totally disabled for up to a year following surgery. It is also true that if Worker chooses to have the surgery at some point in the future, he can seek total disability during the rehabilitation period. *See* § 52–1–56. It does not follow, however, that Worker's claim must be held indefinitely in limbo awaiting such a contingency.

Our Supreme Court affirmed a finding of permanent partial disability in the face of a similar argument by the employer in *Dudley v. Ferguson Trucking Co.*, 61 N.M. 166, 297 P.2d 313 (1956). In that case, the worker sustained a compensable injury when a piece of drilling equipment fell on his foot. As a result, it was necessary to amputate his great toe. He was hospitalized for two-and-a-half months, during which time four surgeries were performed on his foot. The employer offered to pay compensation strictly on the loss of a member. The worker refused the offer. At trial, an orthopedic surgeon testified the worker suffered a 25% disability to the foot, separate and apart from the loss of

the toe. There was also medical testimony which indicated further surgical treatment would probably improve the condition of the worker's foot. On appeal, the employer and its insurer protested that the trial court "allowed an award of compensation for permanent partial disability before an end medical result has been reached." 61 N.M. at 172, 297 P.2d at 316. The Supreme Court noted that, while some of the physicians testified that "further surgery would eliminate part of claimant's disability, there was other testimony ... that claimant had present permanent partial disability in his foot." *Id.* The Court concluded that, although it could not be said the worker's refusal to undergo further surgery was unreasonable, the record supported a finding of partial disability at the time of the hearing.

Reversing the parties' theories, the present case is similar to *Dudley.* Even though Worker's refusal to have surgery was not found to be unreasonable, Dr. Stern's testimony would support a determination of MMI unless and until Worker decides to have surgery. At that time, a petition for increase could be filed.

In effect, accepting Worker's theory would require him to be declared permanently and totally disabled. There was no medical evidence to support such a conclusion and the WCJ consequently found to the contrary.

This Court has rejected the logic underlying Worker's premise that he be given the sole discretion to determine the length of temporary total disability, in *Gonzales v. Lovington Public Schools,* 109 N.M. 365, 785 P.2d 276 (Ct.App.1989), *cert. denied,* 109 N.M. 262, 784 P.2d 1005 (1990). The worker in *Gonzales* argued that under NMSA 1978, Sections 52–1–1 through—69 (Orig.Pamp. & Cum.Supp.1986) (effective from May 21, 1986 through June 19, 1987) ("the 1986 Act"), the WCJ could not make a determination on the extent of permanent disability until it was determined whether the worker would undergo vocational rehabilitation and the results of any such effort became certain. As in the present case, we initially noted that under the worker's compensation system the WCJ had the flexibility to reconsider disability status as the circumstances changed. We then specifically rejected an interpretation of the 1986 Act which gave the worker exclusive control over whether and when he would seek the treatment which would likely lead to a termination of total disability. Speaking for the Court, Chief Judge Bivins said:

> By simply refusing vocational rehabilitation, a worker in need of rehabilitation could be guaranteed permanent total disability. We will not interpret statutes in such a manner that produces absurd results.
>
> In ... a somewhat analogous situation ... we considered the need to prove permanent physical impairment as required by Section 52–1–25 in order to recover permanent total disability under Section 52–1–24. We said that, unless Section 52–1–24 was read to require that proof, a worker, by failing to establish the application of the American Medical Association's guidelines or comparable publication, could be assured of receiving permanent total disability. The same applies here. By refusing rehabilitation without risk of forfeiture or diminution, worker might be assured of permanent total disability benefits.

109 N.M. at 370, 785 P.2d at 281 (citation omitted).

The *Gonzales* Court also rejected claimant's argument that computing disability before the worker decides whether to engage in vocational rehabilitation would be an unauthorized penalty:

> The worker's award is not forfeited or diminished by his refusal to avail himself for rehabilitation. The determination of the worker's status is made without reference to whether or not the worker actually will decide to undertake rehabilitation. The hearing officer, in keeping with the Act's purpose of encouraging and assisting workers to return to gainful employment, assumes that the worker will undertake reasonable rehabilitation. If the worker refuses rehabilitation, his disability benefits are not altered. (On the other hand, if the worker tries rehabilitation and it is not as successful as predicted, he could seek a

redetermination of whether he is totally permanently disabled.)

109 N.M. at 370–71, 785 P.2d at 281–82.

*CONCLUSION*

Worker cannot postpone indefinitely a determination of MMI by declining surgery. The record, taken as a whole, supports the finding that Worker had reached MMI by February 10, 1992, based on his decision to decline surgery. Once the physician has made a determination of MMI, discontinuing temporary total disability and calculating a permanent partial disability does not subject Worker to a Hobson's choice or penalize him for declining surgery. It is merely a determination that Worker has reached a plateau of medical stability for the foreseeable future. As Dr. Stern said, several events, including surgery, may change that medical prognosis, but until such events occur, Worker is entitled to a 26% permanent partial disability.

IT IS SO ORDERED.

BIVINS and ALARID, JJ., concur.