This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**GEORGIA C. LUCERO, a/k/a**
**GEORGIA C. MONTOYA,**

    Worker-Appellee,

v.                                       **NO. 29,066**

**CITY OF ALBUQUERQUE,**
**Self-Insured,**

    Employer-Insured/Appellant.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Victor S. Lopez , Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellee

Paul L. Civerolo, LLC
Paul L. Civerolo
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**KENNEDY, Judge.**

The City of Albuquerque (Employer) appeals the Workers' Compensation Administration's (WCA) order granting benefits to Georgia Lucero (Worker). Employer asserts that the workers' compensation judge (WCJ) erred in ruling that Worker never reached maximum medical improvement, as that term is used in workers' compensation law, and in retroactively granting benefits for a period barred by the statute of limitations. We affirm in part and reverse in part.

**BACKGROUND**

The following facts were either stipulated to by the parties or otherwise appear not to be in dispute. On or about June 3, 1996, Worker injured her right shoulder and upper extremity while working for Employer as a corrections officer. She also injured her left shoulder and spine on August 15, 1996. Although this second injury is not at issue in this appeal both injuries occurred in the course and scope of her employment. Worker was referred to Employer's employee health center and was treated by Dr. James A. Kelemen.

On May 5, 1998, Dr. Anthony Pachelli performed surgery on Worker's right shoulder, and Worker returned to work about a month later. Employer paid Worker temporary total disability (TTD) benefits for the period after surgery during which Worker was unable to work. Dr. Pachelli opined that Worker reached maximum medical improvement (MMI) on July 29, 1998. From October 10, 1998, through

2

November 6, 1998, Employer paid Worker permanent partial disability (PPD) benefits of $17.67 per week. *See* NMSA 1978, §§ 52-1-25.1 (1990) (amended 2005), -26 (1990).

On December 3, 1998, Dr. Pachelli performed a second surgery on Worker's right shoulder, and she returned to work about four months later. Dr. Pachelli opined that Worker reached MMI from this surgery on April 8, 1999.

On January 30, 2001, Worker underwent a third surgery on her right shoulder, performed by Dr. Michael Woods. She did not return to work with Employer and was terminated on February 26, 2001. Dr. Woods opined that Worker reached MMI from this surgery on July 19, 2001. Dr. Woods assigned Worker a 7 percent whole-person impairment. On or about August 10, 2002, Employer stopped paying Worker TTD benefits of $353.33 per week and began paying her PPD benefits of $84.79 per week.

On April 23, 2003, Worker underwent a fourth surgery on her right shoulder, performed by Dr. Samuel Tabet. Employer reinstated TTD payments of $353.33 per week on the same date. Dr. Tabet reported on November 2, 2004, that Worker had reached MMI. In March 2005 Employer terminated TTD benefits and began paying PPD benefits of $109.53 per week.

For part of the period at issue, Worker was treated for psychological issues in addition to the physical ones involving her shoulder. In 2001, pain management

3

specialist Dr. Miguel Pupiales treated Worker and opined in a report dated June 25, 2001, that she suffered from depression attributed to chronic right shoulder pain. Dr. Pupiales referred Worker to psychologist Dr. Edward Naimark, who diagnosed her with pain disorder after seeing her on July 30, 2001. Dr. Naimark noted that Worker's family practice physician had prescribed medication for depressive ideation. Dr. Naimark last saw Worker on September 10, 2001. Worker had cancelled some appointments because she did not feel that Dr. Naimark was helping her condition.

In April or May 2004, Dr. Thomas Whalen, who was seeing Worker for pain management issues, prescribed two medications used to treat depression. Dr. Whalen adjusted Worker's medications and continued to see her at least through March 2007 when he referred her to psychiatrist Dr. Gerald Fredman. Dr. Fredman continued to treat Worker at least through February 6, 2008, the date of his deposition.

Worker filed her complaint with the WCA on June 30, 2003. An order staying proceedings was entered on June 22, 2004, with all rights, claims, and defenses reserved for later determination. The order staying proceedings was lifted on November 28, 2007, and trial was held on June 3, 2008.

The WCJ found that Worker did not reach MMI for her physical injuries until at least November 2, 2004, when Dr. Tabet opined that she had, and that Worker had not yet reached MMI for her "over layering and serious mental condition that was

4

related [to] her work injuries and which continued to need medical attention." Accordingly, the WCJ ordered that Worker was entitled to TTD benefits from May 5, 1998, the day of her first shoulder surgery, to the present, and was entitled to temporary partial disability (TPD) benefits for any periods after the surgeries in which she returned to work but did not earn at or above her pre-injury wage.

**STANDARD OF REVIEW**

We apply a whole record standard of review when considering appeals from judgments of the WCA. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 129, 767 P.2d 363, 368 (Ct. App. 1988). Whole record review requires us to consider all the evidence properly admitted by the WCJ to determine whether there is substantial support for the judgment. *Id.* at 128, 767 P.2d at 367. The entire record is viewed in the light most favorable to the judgment. *Martinez v. Fluor Utah, Inc.*, 90 N.M. 782, 783, 568 P.2d 618, 619 (Ct. App. 1977). To warrant reversal, this Court must be persuaded that it "cannot conscientiously say that the evidence supporting the decision is substantial, when viewed in the light that the whole record furnishes." *Tallman*, 108 N.M. at 129, 767 P.2d at 368. "When reviewing the sufficiency of evidence, we account for the whole record, including what fairly detracts from the result the fact finder reached." *Rodriguez v. McAnally Enters.*, 117 N.M. 250, 252, 871 P.2d 14, 16 (Ct. App. 1994). "To conclude that an administrative decision is supported by

substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so." *Tallman*, 108 N.M. at 128, 767 P.2d at 367 (internal quotation marks and citation omitted).

**STATUTE OF LIMITATIONS**

Employer argues that part of the benefits the WCJ granted to Worker were barred by the statute of limitations. The WCJ's decision that Worker never reached MMI after her first surgery on May 5, 1998, raises the following questions: First, may the WCJ review the entire course of Worker's injury, including the five-year period before she filed her complaint during which Employer paid benefits by agreement. Second, may the WCJ retroactively rule that Worker had never been at MMI even though physicians opined that she was at MMI, and even though Employer paid and Worker accepted benefits based on Worker having been at MMI.

NMSA 1978, Section 52-1-31(A) (1987) provides:

> If an employer or [her] insurer fails or refuses to pay a worker any installment of compensation to which the worker is entitled under the Workers' Compensation Act, after notice has been given as required by [NMSA 1978, Section 52-1-29 (1990)], it is the duty of the worker insisting on the payment of compensation to file a claim therefor as provided in the Workers' Compensation Act not later than one year after the failure or refusal of the employer or insurer to pay compensation. This one-year period of limitations shall be tolled during the time a worker remains employed by the employer by whom [she] was employed at the time of such accidental injury, not to exceed a period of one year.

6

> If the worker fails to give notice in the manner and within the time required by Section 52-1-29 . . . or if the worker fails to file a claim for compensation within the time required by this section, [her] claim for compensation, all [her] right to the recovery of compensation and the bringing of any proceeding for the recovery of compensation are forever barred.

Worker relies in part on *Henington v. Technical-Vocational Institute*, 2002-NMCA-025, ¶ 24, 131 N.M. 655, 41 P.3d 923, in which this Court stated that "it is well settled that Section 52-1-31(A) applies only to initial claims for compensation, not to applications for modification of benefits under [NMSA 1978, Section 52-1-56 (1989)]." Section 52-1-56 sets forth the process to be followed where the condition of a worker receiving benefits either improves or deteriorates, and an adjustment of benefits is appropriate. In *Coslett v. Third Street Grocery*, 117 N.M. 727, 734, 876 P.2d 656, 663 (Ct. App. 1994), we held that the term "installment of compensation" in Section 52-1-31(A) includes underpayments as well as entire payments not made.

The factual setting in *Henington* was somewhat different from the present case. There, as in the present case, the worker and the employer proceeded by agreement for several years after the worker's injury, with no WCA complaint being filed. 2002-NMCA-025, ¶ 6. The worker's knee injury worsened, and the worker eventually filed a complaint with the WCA about seven years after the date of injury. *Id.* ¶¶ 9, 3. In contrast to the present case, the worker in *Henington* did not seek retroactive review of all the benefits he had previously received; he sought only increased benefits going

forward. *Id.* ¶ 6. To the extent that Worker in the present case seeks benefits going forward, we agree that *Henington* controls, and Worker's claim for these benefits is not barred by the statute of limitations.

To the extent that Worker seeks retroactive review of benefits paid since May 5, 1998, the date of her first surgery, we conclude that the one-year limitations period of Section 52-1-31(A) applies, as these benefits pertain to her initial claim for compensation. As Employer notes, to allow retroactive review of all benefits paid since 1998 would effectively render the statute of limitations meaningless. Worker filed her complaint with the WCA on June 30, 2003. In compliance with the one-year limitations period set forth in Section 52-1-31(A), Worker could therefore complain of underpayment of benefits dating back to June 30, 2002. (The tolling provision of Section 52-1-31(A) does not apply, as Employer had terminated Worker on February 26, 2001.) As noted above, Employer had been paying Worker TTD prior to August 10, 2002, after which Employer began paying PPD of $84.79 per week. The WCJ found, and we agree as discussed below, that Worker reached MMI for her physical injuries no earlier than November 2, 2004. Because Worker had not reached MMI as of August 10, 2002, she should have been paid TTD until at least November 2, 2004, based on her physical injuries. August 10, 2002, is within the one-year period prior

8

to Worker filing her complaint, and her claim for underpayment beginning on August 10, 2002, is therefore not barred by Section 52-1-31(A).

**MAXIMUM MEDICAL IMPROVEMENT**

Employer argues that the WCJ erred in failing to accept the dates of MMI as specified by Worker's treating physicians at various times. "As used in the Workers' Compensation Act, 'date of maximum medical improvement' means the date after which further recovery from or lasting improvement to an injury can no longer be reasonably anticipated based upon reasonable medical probability as determined by a health care provider[.]" NMSA 1978, § 52-1-24.1 (1990). We have described MMI as "a determination that [the w]orker has reached a plateau of medical stability for the foreseeable future." *Rael v. Wal-Mart Stores, Inc.*, 117 N.M. 237, 241, 871 P.2d 1, 5 (Ct. App. 1994).

In light of our conclusion above that any claims Worker had before June 30, 2002, are barred by Section 52-1-31(A), we need only consider whether Worker was at MMI after that date. Worker was not at MMI as of June 30, 2002, because the WCJ had rejected the opinion of Dr. Woods that Worker reached MMI from her third surgery on July 19, 2001. The WCJ rejected Dr. Woods's assessment, concluding that "Worker had not attained complete MMI status by [July 19, 2001] because she had not yet obtained the benefit of pain management treatment, and as a result of her

9

continuing psychological condition that was worsening and in need of proper evaluation and treatment." The WCJ pointed out that Dr. Kelemen, Worker's health care provider, referred Worker to Dr. Pupiales in July 2001 for pain management, "with the overall purpose of *improving* Worker's condition." That is, if Worker's condition was subject to improvement, she could not have been at MMI.

Employer stopped paying Worker TTD on August 10, 2002, and began paying PPD as of that date. TTD benefits resumed on April 23, 2003, after Worker's fourth shoulder surgery. The WCJ concluded that Worker never reached MMI for her physical injuries at least through November 2, 2004, as evidenced by the need for repeated surgeries. That MMI date was the opinion of Dr. Tabet, who had performed the fourth surgery about a year and a half earlier. In March 2005 Employer again stopped paying TTD and began paying PPD.

The overriding consideration regarding MMI for Worker, however, is the WCJ's conclusion that Worker did not reach MMI for the psychological issues that had arisen following her physical injuries. The WCJ concluded that the opinions during the relevant period that Worker had reached MMI, even if true with respect to Worker's physical injuries, had not taken into consideration Worker's mental condition.

10

Worker's psychological issues related to her physical injury were first noted in 2001 by Drs. Pupiales and Naimark. Dr. Naimark reported on July 30, 2001, that Worker's family practice physician had prescribed Serzone "for treatment of depressive ideation." Because Worker was already being paid TTD at the time based on her third shoulder surgery, we need not consider whether Worker should have received TTD beginning in 2001 based on her psychological condition.

As discussed below, we agree with the WCJ that Worker had not reached MMI for her psychological issues as of the date of trial.

**MMI FOR PSYCHOLOGICAL CONDITION, ARTIFICIAL DELAY OF MMI, AND FAILURE TO SECURE TREATMENT**

Employer argues that Worker in fact reached MMI, including for her psychological condition, that the WCJ artificially delayed MMI by, among other things, confusing failure to reach MMI with the need for ongoing care, and that for a significant period Worker had failed to seek treatment for her psychological condition.

Employer asserts that it was incongruous for the WCJ to revoke Worker's MMI status on the basis that Worker had ongoing psychological issues, when Worker had received only limited pain management treatment, not treatment for depression, in 2001, had reached MMI in November 2004 based on Dr. Tabet's opinion, and had "no ongoing psychological care until years later."

11

Employer oversimplifies the true course of events. It is true that Worker was treated for pain management in 2001 by Drs. Pupiales and Naimark and that this specific treatment appears to have stalled at some point, with Worker telling her claims adjuster that she did not believe Dr. Naimark was helping her, Dr. Naimark no longer scheduled regular appointments because of Worker's cancellations, and Dr. Pupiales reported on April 9, 2002, that "[a]t this time, there is no further input or services that I can provide." It is apparent, however, that Worker's psychological issues included more than pain disorder and continued through the date of trial.

The WCJ's compensation order thoroughly charts the course of Worker's psychological issues including depression, which had been noted and treated to some extent well before Worker began seeing psychiatrist Dr. Fredman in March 2007. On July 30, 2001, Dr. Naimark diagnosed pain disorder, a recognized mental diagnosis. On that date, Dr. Naimark also noted that for about a year Worker had a prescription from her family practice physician for Serzone, used to treat depressive ideation. Worker asserts that after she informed her claims adjuster in 2001 that she did not believe Dr. Naimark was helping her, the claims adjuster told Worker that she would find someone else. Worker asserts that this was never done.

In January 2004, Worker began seeing Dr. Whalen for pain management issues. On March 9, 2004, Dr. Whalen reported that Worker was "feeling more depressed

12

than previously. She has been on Serzone for 2 years." From April 2004 through May 2005 Worker took medications for depression, including Lexapro and Amitriptyline, as prescribed by Dr. Whalen. On June 9, 2005, Dr. Whalen reported that Worker told him she had been out of Lexapro for two weeks and that the claims adjuster had refused to authorize it. Dr. Whalen opined that discontinuing antidepressants was "extremely dangerous" and that the adjuster's unwillingness to approve it was "totally inappropriate . . . constitutes practicing medicine without a license, not to mention the fact that it is putting [Worker's] life at risk." Dr. Whalen provided Worker with samples of Lexapro and in November 2005 changed her medication to Zoloft. This continued through at least May 16, 2006. Dr. Whalen referred Worker to Dr. Fredman in March 2007. Dr. Fredman treated Worker at least through the date of his deposition on February 6, 2008. Considering this ongoing treatment, the WCJ concluded that Worker had not reached MMI with respect to her psychological issues.

Reviewing the chronology of Worker's psychological issues over the relevant time frame, there is only one period of any significant duration during which Worker did not receive psychological treatment: from the date she stopped seeing Dr. Naimark in September 2001 through early 2004 when she began seeing Dr. Whalen. We first observe that Worker received some level of treatment during at least part of

13

this time, apparently through her own initiative, in the form of Serzone medication from her own physician. For part of the period at issue, Worker was not at MMI because she was recovering from her fourth shoulder surgery, performed on April 23, 2003. Much of the delay in treatment of Worker's psychological condition is attributable to Worker's claims adjuster's failure to follow through on finding another psychologist to replace Dr. Naimark. We agree with the WCJ's finding that "[a]n [e]mployer cannot avoid recognizing a psychological injury—and authorization of related medical expenses and payment of any related TTD benefits—simply by putting its head in the sand and refusing reasonable mental health treatment."

Reviewing the period from August 10, 2002, through the date of trial, it is apparent that at all times Worker was either physically recovering from surgery, being treated for depression and pain management, or incurring a temporary delay in treatment of her psychological condition due to the inaction of Employer. Accordingly, we agree with the WCJ that Worker never reached MMI during this period and was entitled to the benefits the WCJ granted.

**CONCLUSION**

We affirm the WCJ's conclusion that Worker had not reached MMI as of the date of trial, when both her physical and psychological issues are considered. We

reverse the retroactive grant of TTD benefits prior to August 10, 2002, based on the statute of limitations. We remand for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**LINDA M. VANZI, Judge**