This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**MICHAEL F. REDMAN,**

    Worker-Appellee,

v.                                                 **NO. 31,849**

**THE MCCLAIN COMPANY and**
**WESTPORT INSURANCE,**

    Employer/Insurer-Appellant.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Victor S. Lopez, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellee

Hale & Dixon, P.C.
Timothy S. Hale
Paulette J. Dixon
Albuquerque, NM
for Appellant

**MEMORANDUM OPINION**

**ZAMORA, Judge.**

{1}    Michael F. Redman (Worker) injured his left knee while working as a floor sander and refinisher for The McClain Company (Employer) in April 2010 and sought

benefits under the Workers' Compensation Act (the Act). The workers' compensation judge (WCJ) determined that Worker was eligible for scheduled injury benefits at seventy-five percent of his eligibility and was also entitled to a resumption of full temporary total disability (TTD) benefits because Worker was no longer considered at maximum medical improvement (MMI). Employer challenges that order, and we affirm in part and reverse in part and remand.

**BACKGROUND**

{2}     Because both parties are familiar with the facts of the case, we do not provide details of the background. In our discussion below, we will provide relevant facts and background information as is necessary to assist in our analysis.

**DISCUSSION**

{3}     Employer makes three arguments on appeal: (1) that Worker is entitled to no benefits because he voluntarily removed himself from the work force for reasons separate from his knee injury; (2) that Worker remained at MMI even after returning to his regular physician for follow-up treatments and thus should not be eligible for renewed TTD benefits; and (3) that the WCJ erred in awarding seventy-five percent partial loss-of-use benefits for the knee injury under the schedule for injuries to specific body members. After setting forth the standard of review, we address those issues in order.

## I. Standard of Review

{4} "We review factual findings of Workers' Compensation Administration judges under a whole record standard of review." *Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341. Under this standard of review, we "examine all the evidence and disregard that which has little or no worth." *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 128, 767 P.2d 363, 367 (Ct. App. 1988), *holding modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148. "Whole record review . . . contemplate[s] a canvass by the reviewing court of all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result." *Id.* In doing so, we give deference to the fact-finder on review. *Dewitt*, 2009-NMSC-032, ¶ 12. "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision, and we neither reweigh the evidence nor replace the fact[-]finder's conclusions with our own." *Id.* (citation omitted).

## II. Whether Worker Voluntarily Removed Himself from the Work Force

{5} Employer first argues that Worker is not eligible for benefits because he voluntarily took himself out of the work force rather than left his job because of the

3

injury to his knee. Employer points to no part of the record proper to show that any such evidence was presented to the WCJ. In its reply brief, Employer cites only to its own proposed conclusions of law—which provide no citation to the record—and to its docketing statement to this Court.

{6} There is no cite to the record that this argument was presented to the WCJ. *See In re Norwest Bank of N.M., N.A.,* 2003-NMCA-128, ¶ 30, 134 N.M. 516, 80 P.3d 98 (stating that this Court will not search the record for evidence of preservation). As such, it has not been properly preserved and will not be considered here on appeal. *See Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 22, 137 N.M. 734, 114 P.3d 1050 (stating that "because this issue was not raised and briefed by the parties below, [the appellate courts] will not consider it for the first time on appeal"); *Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 114 N.M. 103, 108, 835 P.2d 819, 824 (1992) (noting that where a party fails to cite any portion of the record to support its factual allegations, an appellate court need not consider its argument on appeal). We now proceed to the two main issues before us.

**III.  Whether Worker Remained at MMI**

{7} Worker's injury occurred on April 20, 2010, and he received treatments from his primary care physician in June and July, followed by surgery to repair a torn meniscus in August. After follow-up visits in October and November, a functional

4

capacity evaluation (FCE) was conducted on November 30, 2010. Based on that assessment, Worker was deemed to have reached MMI on November 30, at which time TTD benefits ceased. After a break from seeing his primary care physician for ten-and-a-half months, Worker returned for treatment on September 16, 2011, for a series of injections to his knee to provide relief from his symptoms. The WCJ ruled that when Worker returned for treatment he was no longer at MMI. The WCJ reasoned that Worker had returned to "regular treatment" and thus was eligible again for TTD benefits of $367.86 per week after that date as long as such treatment continued. Employer contends that the WCJ erred in concluding that Worker was no longer at MMI.

{8}     The Act provides for TTD benefits for a worker who is unable to perform his or her duties. NMSA 1978, §52-1-25.1 (2005). Those benefits are available to a worker up until the time of MMI, which is defined as "the date after which further recovery from or lasting improvement to an injury can no longer be reasonably anticipated based upon reasonable medical probability as determined by a health care provider[.]" NMSA 1978, § 52-1-24.1 (1990). We have previously noted that "whether a worker has reached MMI turns on proof of a reasonable medical probability of future recovery and lasting improvement." *Smith v. Cutler Repaving*, 1999-NMCA-030, ¶ 12, 126 N.M. 725, 974 P.2d 1182. We have characterized the

inquiry as one of assessing whether the worker "has reached a plateau of medical stability for the foreseeable future." *Rael v. Wal-Mart Stores, Inc.*, 117 N.M. 237, 241, 871 P.2d 1, 5 (Ct. App. 1994). "Key to determining MMI is expert medical testimony regarding whether the injured worker is more likely than not to recover further." *Smith*, 1999-NMCA-030, ¶ 10 (internal quotation marks and citation omitted). "We address each MMI finding separately." *Id.*

{9}     In the case before us, Worker's primary care physician, Dr. Pachelli, testified that the resumption of treatment in September 2011 was for pain management, that the injury was expected "to stay the same," and that Worker remained at MMI.  Dr. Pachelli testified that the treatment plan was to give Worker three weekly injections, which would relieve his symptoms for about eight months, a regimen that could be repeated three or four times at the most.

{10}     We have stated that "continuing treatment is consistent with [MMI] if it produces improvement that is only symptomatic relief." *Baca v. Bueno Foods*, 108 N.M. 98, 100, 766 P.2d 1332, 1334 (Ct. App. 1988).  We are instructed to "look for a recovery—not temporary improvement, but lasting improvement" to warrant a change in MMI status. *Id.* at 101, 766 P.2d at 1335 (emphasis omitted).

{11}     In *Smith*, we acknowledged that a worker with a foot and ankle injury "continue[d] to suffer" and required further treatment but that the extent of the injury

"had not appreciably changed" since a determination of MMI. 1999-NMCA-030, ¶¶ 2, 11-12. We concluded that "it was reasonable for the WCJ to conclude that [the w]orker was not 'more likely than not' to recover further." *Id.* ¶ 11 (citation omitted). In *Rael*, the worker argued that he should not have been deemed to have reached MMI until he made a decision whether to have surgery on his injured back. 117 N.M. at 238, 871 P.2d at 2. There, we found the worker to have been at MMI, and we endorsed the assessment of a treating physician who testified that "if I'm asked is this patient as good as he's going to be, at this point in time, and for the foreseeable one to three years, if I feel that is the case, I will say the patient is at [MMI]" and that "the chances are that a given patient will be about like as he was now, which I think in the context of [MMI] means a year or two." *Id.* (internal quotation marks omitted).

{12} Here, the only medical expert testimony regarding MMI was that given by Dr. Pachelli, who deemed Worker to have remained at MMI, even after returning for further treatment. Dr. Pachelli testified that no new pathology was present. Follow-up injections were done to relieve pain in the knee and would provide only temporary relief or improvement to Worker's symptoms. Dr. Pachelli stated that the injection therapy would "likely not continue to work forever" and "may work two or three, maybe four times, but it probably won't work after that." He concluded: "If his

symptoms are significantly better, he may function better. But for practical terms, work restrictions, things like that, I think it is going to stay the same."

**{13}** We conclude that the testimony of the medical provider below shows that Worker, like the workers in *Rael* and *Smith*, had not experienced a change in the status of his injury and, like the worker in *Baca*, was merely receiving treatment to obtain temporary improvement to his symptoms. And because Dr. Pachelli, the only medical provider to testify, could foresee no change in pathology or level of impairment to Worker's left knee, Worker remained at the point at "which further recovery from or lasting improvement to [his] injury [could] no longer be reasonably anticipated based upon reasonable medical probability as determined by a health care provider[.]" Section 52-1-24.1. Therefore, the WCJ erred in determining that Worker was no longer at MMI and in awarding TTD benefits after September 16, 2011.

**IV.     Whether the WCJ Erred in Awarding Loss-of-Use Benefits**

**{14}** In addition to TTD benefits, Worker also sought compensation based on the loss of use of his left knee under NMSA 1978, Section 52-1-43 (2003) of the Act covering injuries to specific body parts, or scheduled members. Employer contends that the evidence presented below was insufficient to support the WCJ's conclusion that Worker had suffered a loss of use of his knee of seventy-five percent. Employer asks us to reverse the award and remand to the WCJ to reconsider the percentage loss

of use of the knee. Employer, however, does not suggest an alternative way to calculate the percentage loss of use of the knee.

{15} The parties agree that the injury is covered by the schedule dictating benefits for injuries to specific body parts under Section 52-1-43. Under that section, Worker is entitled to 150 weeks of benefits for the partial loss of use of his left knee "computed on the basis of the degree of such partial loss of use[.]" Section 52-1-43(A)(30), (B). The question of benefits thus turns on the degree of Worker's loss of use of his left knee. We start by considering the concept of impairment.

{16} The Act defines "impairment" as "an anatomical or functional abnormality existing after the date of maximum medical improvement as determined by a medically or scientifically demonstrable finding and based upon the most recent edition of the American [M]edical [A]ssociation's [AMA] guide to the evaluation of permanent impairment or comparable publications of the [AMA]." NMSA 1978, § 52-1-24(A) (1990). Our appellate courts have made it clear, however, that a WCJ need not rely solely on impairment as defined by the AMA guidelines when calculating a worker's loss of use of a scheduled member. *See Torres v. Plastech Corp.*, 1997-NMSC-053, ¶ 24, 124 N.M. 197, 947 P.2d 154 ("In order to demonstrate an impairment under the scheduled injury section, it is not necessary to present evidence conforming to the AMA guidelines under the definition of impairment in

9

Section 52-1-24(A)."); *Lucero v. Smith's Food & Drug Ctrs., Inc.*, 118 N.M. 35, 37, 878 P.2d 353, 355 (Ct. App. 1994) (stating that "we cannot say that the incorporation of the concept of impairment according to AMA guides into the disability sections necessarily means that it must be incorporated into the scheduled injury section"). Our Supreme Court has referred to the AMA guide as "a general framework, requiring flexibility in its application." *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 19, 122 N.M. 524, 928 P.2d 250. "While the AMA Guide was intended to help standardize the evaluation of a worker's impairment, it was not intended to establish a rigid formula to be followed in determining the percentage of a worker's impairment." *Id.*

{17} Thus, "loss of use" of a scheduled member takes into account more than just "impairment" as defined by the Act. We have previously acknowledged that other factors may be considered to calculate the loss of use of a scheduled member. *Valdez v. Wal-Mart Stores, Inc.*, 1998-NMCA-030, ¶ 24, 124 N.M. 655, 954 P.2d 87 (taking into account the worker's vocational background, limitations resulting from the injury, and the worker's pain level). "There must be sufficient evidence for a [WCJ] to determine a total loss of use or 'the degree of such partial loss of use' of the scheduled member." *Torres*, 1997-NMSC-053, ¶ 24 (citation omitted).

{18}     In the case before us, the two percent impairment rating based on the AMA guidelines was just one factor considered in calculating Worker's partial loss of use of his left knee. Evidence was presented of Worker's injury and loss of use of his knee. An impairment rating of two percent loss of use based on AMA guidelines was given by two physicians. Worker's primary treating physician, Dr. Pachelli, also testified that in addition to that two percent rating from the AMA guidelines, the injury made it problematic for Worker to perform his job duties and that returning to work could lead to re-injury. Employer's vice president, Eppy Cortez, also described the duties of a floor sander/refinisher that involved physically demanding activities such as kneeling, bending, and squatting. The FCE conducted by Theresa Barton, a physical therapist, cataloged eleven specific movement restrictions, later cited by the WCJ, and stated that Worker "would not be safe to work on hands and knees or twisting or bend[ing] frequently," which were "activities . . . required when working as a [f]loor [r]efinisher." Dr. Pachelli testified that combining the two percent impairment rating with the FCE meant that Worker suffered a career-ending injury. Furthermore, Worker and his girlfriend testified extensively about the daily impact of Worker's injury, which limited his ability to sit or stand for extended periods, to go fishing as he had done regularly before the injury, to attend movies, to garden, to walk the dog, to carry out household chores, to climb stairs, and to perform sexually. {19}

11

In a separate calculation for purposes of requesting benefits for permanent partial disability (PPD), Worker submitted a formula that resulted in a seventy-three percent impairment rating. In his counsel's closing argument and proposed findings of fact, Worker requested a ninety-nine percent loss-of-use rating for the scheduled injury benefit, the maximum allowed under the Act. *See* NMSA 1978, § 52-1-26 (C) (1990). The WCJ made the following finding:

> After November 30, 2010, Worker suffered a "loss of use" to the left knee of 75 percent, and he was accordingly entitled to benefits under the schedule until September 16, 2011; his "loss of use" is based on the fact that Worker was substantially limited to a sedentary physical capacity, including the following restrictions: a) no running, b) no jumping, c) no kneeling, d) no crawling, e) no frequent climbing, f) no frequent squatting, g) no frequent twisting, h) no frequent bending, i) no prolonged sitting more than 60 minutes at one time, j) no prolonged standing for more than 60 minutes at one time, and k) no prolonged walking for more than 60 minutes at one time.

{20} After reviewing the record as a whole and giving deference to the fact-finder, we cannot say that substantial evidence did not exist for the WCJ to assess Worker's partial loss of use of his left knee at seventy-five percent, considering Worker's inability to perform the functions of a floor sander/refinisher, the restrictions on his leisure activities, and the testimony of medical personnel about the scope of the injury. We conclude that the WCJ did not err in assessing a seventy-five percent partial loss of use for Worker's scheduled injury benefit.

12

**CONCLUSION**

{**21**}     For the foregoing reasons, we affirm the loss-of-use determination by the WCJ and reverse the ruling on MMI, and we remand for proceedings consistent with this Opinion.

{**22**}     **IT IS SO ORDERED.**


_____
**M. MONICA ZAMORA, Judge**


**WE CONCUR:**


_____
**JONATHAN B. SUTIN, Judge**


_____
**MICHAEL E. VIGIL, Judge**